## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **ROSE GREENMAN,**<br><br>        **Plaintiff,**<br><br>**v.**<br><br>**CITY OF HACKENSACK, et al.,**<br><br>        **Defendants.** | Civ. No. 15-3274 (KM)(MAH)<br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

The plaintiff, Rose Greenman, an elected City Council member for the City of Hackensack from May 2013 until her resignation in March 2015, brings this action under 42 U.S.C. § 1983 seeking redress for Defendants' allegedly discriminatory behavior. The three remaining defendants—the City, Mayor John P. Labrosse, Jr., and Deputy Mayor Kathleen Canestrino—now submit through different counsel two motions for summary judgment encompassing all eight remaining counts of the Complaint. (DE 146; DE 148)

For the reasons expressed herein, defendants' motions for summary judgment are DENIED as to Count 1 (42 U.S.C. § 1983 claim of First Amendment retaliation), Count 3 (§ 1983 equal protection), and Count 8 (parallel claims under the New Jersey Civil Rights Act). As to all other claims, summary judgment is GRANTED in defendants' favor.

I.     **Summary**[1]

A.     **Facts**[2]

In 1972, Ms. Greenman immigrated to the United States from the former Soviet Union, and in 2007 she became a United State citizen. (DSOF ¶ 2) She is Jewish, a fact relevant to her claims in this action. (*Id.*)

In 2013, Ms. Greenman was elected to the City of Hackensack's Council, and served in that capacity from July 1, 2013 until she resigned on March 31, 2015. (DSOF ¶ 1) Ms. Greenman ran on the same ticket and ultimately served on the council with members, John Labrosse (Mayor), Kathleen Canestrino (Deputy Mayor), Leonardo Battaglia, and David Sims, all of whom ran as the "Hackensack First" party. (*Id.* ¶¶ 4, 6)

When elected, Ms. Greenman received a new employee packet from the City that included a welcome letter titled "Welcome to Employment with the City of Hackensack." (PSOF ¶ 2; DE 150-5) Ms. Greenman also received an employee handbook that outlined Ms. Greenman's "rights and obligations" as "a City employee." (DE 150-5 at 3) Included in the handbook was the City's

---

[1]     Certain citations to the record will be abbreviated as follows:

"DE" = Docket entry number in this case.

"DSOF" = Defendants' statement of undisputed facts. (DE 146-5)

"PRSOF" = Plaintiff's responsive statement of facts. (DE 151)

"PSOF" = Plaintiff's counterstatement of undisputed facts. (DE 151)

"Canestrino Dep."= The deposition transcript of Kathleen Canestrino (DE 150-4)

"Greenman Dep." = The deposition transcript of Rose Greenman, Volumes I and II. (DE 146-3 at 31–121)

"Labrosse Dep." = The deposition transcript of John Labrosse, Jr. (DE 150-2)

[2]     Defendants did not file any response to Plaintiff's supplemental statement of fact. Local Civil Rule 56.1 provides that "In addition, the opponent may also furnish a supplemental statement of disputed material facts, in separately numbered paragraphs citing to the affidavits and other documents submitted in connection with the motion, if necessary to substantiate the factual basis for opposition. The movant shall respond to any such supplemental statement of disputed material facts as above, with its reply papers." Accordingly, I will deem any well-supported fact in Plaintiff's counter statement to be undisputed. *Id.* ("[A]ny material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion.").

anti-harassment policy. (*Id.* ¶ 3) It is undisputed that Ms. Greenman was paid a regular salary and received employee benefits, such as counseling, retirement benefits, and health insurance. (*Id.* ¶¶ 4-5; Labrosse Dep. p. 13 (admitting City invested a portion of his paycheck into a City run pension fund))

Hackensack "has a Council-Manager form of government pursuant to N.J.S.A. 40:79-1 et seq. (Municipal Manager Act of 1923). In this form of government, the Manager is the chief executive and administrative official of the municipality." (DSOF ¶ 3) Council members serve four-year terms and exercise legislative and policy power over the City, including selecting the Mayor, and, adds Plaintiff, the Council "may investigate the administration, may determine internal organization and may create and abolish boards and organizations . . . [and the] Mayor shall make appointments to the Library Board." (*Id.*; PRSOF ¶ 3)

While serving on the council, Ms. Greenman was appointed by the Mayor to be his liaison to the library board and attended most library board meetings. (DSOF ¶¶ 8, 10; DE 146-3 at 320) She was also a member of the finance and budget committees without having been appointed by Labrosse. (DE 150-4 ("Canestrino Dep.") p. 69)

Ms. Greenman asserts that council members made numerous statements to her concerning her religion and ethnicity. As to Mr. Labrosse, Ms. Greenman testified that he told her she was not a real Hackensackian or a real American and he was going to make her life miserable, that he initially refused to allow her to have a rabbi at her swearing-in ceremony, that he once told her that he attributed the failure of his fish business to the Jews in the area not supporting his business because the fish was not kosher, and that he mocked her accent by asking if she understood English. (Greenman Dep. pp. 55-56, 74-75, 79-83, 91) Mr. Labrosse mostly denied these allegations. He admits, however, telling Ms. Greenman she was not a real Hackensackian and that if she did not cooperate with the council, her life would be a nightmare. (Labrosse Dep. pp. 139-141) These, comments, he says, were simply part of an effort to help Ms. Greenman understand the importance of not trying to go in a

different direction from the rest of the council. (*Id.*) Mr. Labrosse also admitted to asking Ms. Greenman whether she understood English; this, he said, was not an expression of disrespect but a bit of sarcasm after he having to repeat himself several times when speaking to her. (*Id.* pp. 144-45)

Ms. Greenman asserts that Ms. Canestrino also made statements about her race and ethnicity. For example, at a 2013 church event, Greenman testified that Canestrino asked Plaintiff if she was "afraid to be in a church" and then stated that she could not undergo the sacrament because "the holy water will make you fizzle and melt into a puddle of scum." (Greenman Dep. p. 74, 109-10, 167-68) On a different occasion, Ms. Greenman stated that Ms. Canestrino complained about her physician's holiday decorations, stating "Who cares about Hanukah?" Plaintiff also contends that numerous insulting messages have been posted to online forums and she believes that Canestrino is the individual responsible for these messages. A June 20, 2014 posting entitled "Rosie Girl" was posted by someone under the name "Ethel Rosenberg." (Greenman Dep. p. 171) Ms. Greenman confronted Ms. Canestrino because the posting contained information that Greenman had provided to Canestrino her at an earlier meeting. (*Id.* pp. 171-72) Ms. Greenman testified that Canestrino laughed off the accusation, stating that it was not her, but that she knew enough people who could post this for her. (*Id.*) Canestrino denies all of these claims. (Canestrino Dep. p. 154-55, 157)

During the summer of 2014, the council was in the process of renegotiating a collective bargaining agreement with the police and a formulating a revised budget. (PSOF ¶ 8) Ms. Greenman was at odds with the rest of the council, and she publicly and repeatedly voiced concerns about the increases in salary demanded by the police. As a result, when speaking at council meetings she was frequently booed and interrupted by police officers who were in attendance. (*Id.* ¶ 9; DE 150-7)

On July 21, 2014, Ms. Greenman emailed the City of Hackensack attorney asking for an investigation: "I would like, yet again, to bring to your

attention the illegal conduct of Mayor Labrosse, Deputy Mayor Canestrino and Police Director Mordaga. . . . On numerous occasions Mayor Labrosse threatened and intimidated me for standing up to his illegal behavior by using racist and anti-Semitic language that referenced my national origin, my ethnicity and my accent." (DE 150-7) Ms. Greenman also raised in this letter that Canestrino was attempting to intimidate and retaliate against her for speaking out by threatening to take away her health insurance. (*Id.*) Ms. Greenman asked that her claims be investigated. (*Id.*) Labrosse was aware that Ms. Greenman requested that her allegations be investigated. (Labrosse Dep. p. 72) Ms. Greenman's complaints were never investigated. (PSOF ¶ 22; DE 150-16 at 2-3)

Following this complaint, on "August 7, 2014, Plaintiff received a notice from the City's Zoning Department that there was a complaint that Plaintiff was using her apartment as a law office in violation of the City's zoning ordinance." (DSOF ¶ 17) Defendant Salkin, a former council member, was the one who filed the complaint. Plaintiff refused to permit the City's zoning officer, Albert Borelli, to inspect her apartment because he did not have a warrant to do so. (*Id.* ¶ 18)

On August 13, 2014, the local finance board of the Department of Community Affairs ("DCA") held a public meeting. (DE 146-3 (DCA transcript) at 122-309) Canestrino, the mayor's designated appointee to present at the meeting, discussed the City's plan to finance the funding of settlements of tax appeals that had accumulated against the City. (*Id.* at 218-229) Canestrino represented that she was presenting on behalf of the mayor and the rest of the council. (*Id.* at 223) At the same meeting, the subject of health benefits for council members was raised, and it was noted that only one unnamed council member received health benefits. (*Id.* at 232-33) Ms. Greenman attended the meeting. (PSOF ¶ 13) Ms. Canestrino testified that "Plaintiff was not invited to be a delegate at the meeting" and that she was not appointed to attend the meeting. (PSOF ¶ 12; Canestrino Dep. p. 121)

During the public comment portion of the meeting, Ms. Greenman and two other residents of Hackensack spoke to the board to raise concerns about the new police contract that the Council had passed. They alleged that the City was misappropriating funds. (DSOF ¶ 21) Ms. Greenman introduced herself and explained that she was a city council member. (DSOF ¶ 20; PRSOF ¶ 20). In particular, she let it be known that the council had approved the new police contract without examining it; therefore, she objected to the way the council negotiated the contract and objected to obtaining a loan to pay for the contract. (*Id.* at 234-248 ("The rest of the council would not be interested in it. How can you vote for something without ever having to eyeball it?. . . there must be an oversight. I cannot alone by myself control it if the people are not telling the truth."); DSOF ¶¶ 22-26))

On August 15, 2014, criminal charges were brought against Ms. Greenman based on her failure to allow inspection of her apartment. (DSOF ¶ 29)

On August 18, 2014, Canestrino introduced Resolution No. 300-14. (DE 146-3 at 28-29) The resolution prohibited Hackensack elected city officials and part-time city employees from receiving city-funded health insurance benefits as of November 1, 2014. (*Id.*) Defendants point to the fact that the DCA lists excluding healthcare coverage for appointed officials in their "best practice" worksheet. (DSOF ¶ 28) Plaintiff notes that this had been a best practice for years but had only been brought to a resolution once Plaintiff spoke out at the DCA meeting. (PRSOF ¶ 28) Ultimately, Battaglia, Canestrino, Sims, and Labrosse all voted in favor of the resolution; Greenman was the only "no" vote. (*Id.*) Ms. Greenman was the only council member who relied on the City's healthcare insurance. (PSOF ¶ 15)

At some point thereafter, Canestrino and Greenman discussed issues concerning the library board. According to Canestrino, she indicated to Plaintiff that the library board was having difficulty communicating with Plaintiff and that the council was unhappy with her attendance at library board meetings. (DSOF ¶¶ 34-35) Greenman contests Canestrino's account, stating that

6

Canestrino said that her English was not sufficiently proficient to communicate with the library board. (DSOF ¶ 36) In any event, Greenman states, this issue was manufactured by the council; the library board director, Sharon Constantine, testified that no library board members had ever complained that they could not communicate with Ms. Greenman or taken issue with her performance on the board. (PSOF ¶ 18; *see also* DE 150-13 (Constantine Dep.) pp. 50-53) Greenman requested an explanation in writing from the mayor for her removal from the library board, which was never provided. (PSOF ¶ 19)

In October 2014, the council removed Greenman from the library board. (*Id.* ¶ 37)

On January 6, 2015, former council member Salkin spoke at a public meeting. (DSOF ¶ 39) Salkin complained about Ms. Greenman and her potential zoning ordinance violations and read a poem in which he called Ms. Greenman a "sociopath." (*Id.* ¶¶ 39-40) On January 8, 2015, the charges against Ms. Greenman were dropped because the city's zoning officer did not have a warrant and therefore Ms. Greenman was within her rights to refuse to allow the officer to search her home. (*Id.* ¶ 41)

On March 31, 2015, Ms. Greenman resigned "due to the discrimination based on race, religion, and national origin which I have faced, as well as the retaliation that I have faced after I spoke out as a citizen as to matters of public concern." (PSOF ¶ 23; DE 150-17)

## B.   Procedural History

On May 12, 2015 Ms. Greenman filed a Complaint. (DE 1) The Defendants named in the Complaint were:

> The City of Hackensack
>
> Mayor John Labrosse
>
> Deputy Mayor Kathleen Canestrino
>
> Richard Salkin, former council member and legal counsel for the City Board of Education
>
> Art Koster, City personnel director and acting City manager
>
> Albert Borelli, zoning officer

The causes of action originally asserted in the Complaint were as follows:

**Count 1** — First Amendment Retaliation (42 U.S.C. § 1983) (against Hackensack, Labrosse, and Canestrino)

**Count 2** — NJ Conscientious Employee Protection Act ("CEPA") (N.J Stat. Ann. § 34:19-1) (against Hackensack, Labrosse, and Canestrino)

**Count 3** — Religious and ethnic discrimination (42 U.S.C. § 1983) (against Hackensack, Labrosse, and Canestrino)

**Count 4** — Religious and ethnic discrimination (NJ Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5) (against Hackensack, Labrosse, and Canestrino)

**Count 5** — Malicious Prosecution (42 U.S.C. § 1983) (against all Defendants)

**Count 6** — Malicious Prosecution Conspiracy (42 U.S.C. § 1983) (against all Defendants)

**Count 7** — Abuse of Process (42 U.S.C. § 1983) (against all Defendants)

**Count 8** — NJ Civil Rights Act ("NJCRA") (N.J. Stat. Ann. § 10:6-2) (against all Defendants)

**Count 9** — State law defamation (against Salkin)

On July 17, 2015, Defendants Hackensack, Labrosse, and Canestrino filed a motion to dismiss Counts 2 (CEPA) and 4 (NJLAD). (DE 13) Plaintiff conceded in her opposition to Defendants' motion to dismiss that Count 4 must fail as to Labrosse and Canestrino. (DE 23-1 at 5) Accordingly, on March 2, 2016, I dismissed Count 4 solely as to Labrosse and Canestrino; Defendants' motion to dismiss Counts 2 and 4 was denied in all other respects. (DE 44, DE 45)

In December 2017, the Parties filed and I so-ordered a stipulation of dismissal as to Defendant Salkin. (DE 82; DE 83) As a result, Count 9, which was asserted against Salkin alone, was dismissed. In October 2018, the Parties filed and I so-ordered a stipulation of dismissal as to Defendants Koster and Borelli. (DE 112; DE 113)

On January 30, 2020, the remaining Defendants (Hackensack, Labrosse, and Canestrino) moved for summary judgment on Counts 1, 2, 3, 4, and 8. (DE

146) On January 31, 2020, the same three Defendants filed a second motion for summary judgment on Plaintiffs' common law tort claims, Counts 5 (Malicious Prosecution), 6 (Conspiracy to commit Malicious Prosecution), and 7 (Abuse of Process).

Plaintiff has filed a response in opposition as to Counts 1 through 4 and 8.  Plaintiff has voluntarily dismissed the Count 3 due process claim (but not the Count 3 equal protection claim, so Count 3 remains). (DE 150 at 1) Plaintiff does not oppose Defendants' motion as to Counts 5, 6, and 7, and voluntarily consents to the dismissal of those counts. (DE 150 at 2 n.2 ("A second Motion for Summary Judgement was filed regarding Plaintiff's claims for Malicious Prosecution, Conspiracy to Commit Malicious Prosecution and Abuse of Process. Plaintiff voluntarily dismisses those claims and thus will not address counts V, VI, VII of her Complaint.")). I will therefore **grant on consent** Defendants' motion for summary judgment (DE 148) as to the due process component of Count 3, as well as Counts 5, 6, and 7.

Consequently, the only remaining Defendants are the City of Hackensack, Mr. Labrosse, and Ms. Canestrino. The only remaining claims are

Count 1 (First Amendment retaliation)

Count 2 (CEPA)

Count 3 (equal protection only)

Count 8 (NJCRA)

all as to Hackensack, Labrosse, and Canestrino; and

Count 4 (NJLAD) as to Hackensack only.

## II.   Discussion

### a.  Legal standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion

for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex*, 477 U.S. at 322-23. "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist).

Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 111 L. Ed. 2d 695, 110 S. Ct. 3177 (1988) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). Thus, if the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element

of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### b. Count 1: First Amendment Retaliation Under Section 1983

In Count 1, Ms. Greenman brings a claim of First Amendment-based retaliation under 42 U.S.C. § 1983.

Ms. Greenman contends that, at an August 13, 2014 DCA meeting, she made public statements that angered the Defendants. (DE 150 at 13) In retaliation, she alleges, Defendants eliminated her health insurance and removed her from the library board. (*Id.* at 17) Defendants respond that Ms. Greenman's statements were not protected by the First Amendment because she was speaking in her official capacity as a councilwoman, and not as a private citizen. (*Id.* at 18-20) Moreover, say Defendants, Ms. Greenman cannot establish a causal connection between her statements and any adverse employment action. (*Id.* at 13-14, 20-22)

The First Amendment enshrines the right of the people to petition the government for redress of grievances. U.S. CONST. amend I. When that right is infringed by state officials, Section 1983 of the Civil Rights Act of 1871 provides a remedy;

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities

> secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper
> proceeding for redress.

42 U.S.C. § 1983. Section 1983 allows a party who has been deprived of rights, privileges, or immunities secured by the Constitution to seek damages and injunctive relief. *See id.*

A prima facie case under § 1983 requires a plaintiff to demonstrate that: (1) a person deprived her of a federal right; and (2) the person who deprived her of that right acted under color of state law. *Groman v. Twp. of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995) (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)). The alleged retaliatory conduct—taking away Ms. Greenman's health insurance and library board position—consisted of official actions at council meetings. The parties therefore do not dispute Element (2), *i.e.,* that Defendants acted under color of state law. *See Willson v. Yerke*, 604 F. App'x 149, 150 (3d Cir. 2015). What the parties do dispute is Element (1), *i.e.,* that Ms. Greenman was deprived of a federal First Amendment right.

A claim of First Amendment retaliation requires that a plaintiff establish "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising [her] constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006) (citing *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003)). The alleged retaliatory conduct must have had an impact on the plaintiff's First Amendment rights that was more than minimal. *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006); *Brennan v. Norton*, 350 F.3d 399, 419 (3d Cir. 2003).

### i. First Amendment protections against retaliation

According to Defendants, discovery has proven that Ms. Greenman cannot establish elements (1) constitutionally protected speech, and (2) a causal link between Greenman's speech and any purported retaliatory actions taken by the council. (DE 146-4 at 18-24) Ms. Greenman disagrees, stating that her public denunciation of the council's alleged financial irresponsibility

was protected speech because she spoke as a concerned member of the public. (DE 150 at 12-15) Moreover, Greenman asserts that there is sufficient circumstantial evidence of a connection between her speech and Defendants' retaliation.

I pause here to reformulate the issue somewhat. As conceived by the parties, it is binary: Ms. Greenman either spoke as a private citizen, and therefore enjoyed the widest First Amendment protection, or she spoke as a public employee, and enjoyed little or none under *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). That either/or analytic framework, I believe, is too simple. An elected official's First Amendment status, particularly vis-à-vis a claim of retaliation, must be analyzed on its own terms.

A *private citizen's* expression enjoys broad First Amendment protection. Even if she happens to be employed by a public agency, her employer cannot retaliate against her for expressing her opinions as a private citizen. *See Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).[3] There is a minimal requirement

---

[3]      Under *Garcetti v. Ceballos,* the inquiry involves both the public role of the speaker and the nature of the expression:

> [There are] two inquiries to guide interpretation of the constitutional protections accorded to public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. *See id.*, at 568, 88 S. Ct. 1731. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. *See Connick, supra*, at 147, 103 S. Ct. 1684. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. *See Pickering*, 391 U.S., at 568, 88 S. Ct. 1731. This consideration reflects the importance of the relationship between the speaker's expressions and employment. A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.

*Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). "The Court has made clear that public employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Id.* at 417, 419.

that the alleged retaliatory act be "sufficient to deter a person of ordinary firmness from exercising his constitutional rights." *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006) (citation omitted). Depending on the context, however, fairly minor forms of retaliation may be actionable.[4]

A *public employee*, by contrast—when speaking not privately but *as* a public employee—has limited First Amendment rights and may be disciplined or fired for what would otherwise be protected speech. Indeed, the government employer has the right to dictate what an employee may or may not say in connection with public business. In the case of public employees, "restrictions on speech are permissible because, 'when a citizen enters government service, the citizen must accept certain limitations on his or her freedom.' [citing *Garcetti*]." *Werkheiser v. Pocono Twp.*, 780 F.3d 172, 177 (3d Cir. 2015). A public employee's statement is protected only if "(1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have an adequate justification for treating the employee differently from any other member of the general public as a result of the statement he made." *Young*, 629 F. App'x at 357 (citing *Garcetti*). The parties disagree, however, over whether Ms. Greenman, an elected official, ought to be treated as a "public employee" under *Garcetti*.

As to an *elected official,* "[t]he manifest function of the First Amendment in a representative government requires that legislators must be given the widest latitude to express views on issues of policy." *Bond v. Floyd*, 385 U.S. 116, 136-37 (1966). When an elected official is speaking on matters of public concern, no authority can dictate the positions she may take; she must be free. But the question then becomes "Free from what?" I conclude that certain acts,

---

[4]     Consider, for example, the U.S. Supreme Court's observation in dictum that "the First Amendment . . . already protects state employees . . . from even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights". *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75 n.8 (1990) (quotations omitted). My docket has never included such a birthday-party-based claim, but this dictum does demonstrate the Court's hypervigilance where infringement of free expression is concerned.

which surely would constitute coercion or retaliation in other contexts, are permissible in the realm of electoral politics. An elected official may suffer all sorts of adverse consequences on the basis of her political positions. That is not, however, because she is a "public employee" whose official speech may be dictated by her superiors; rather it is because she is in the arena of democratic politics, where we expect and indeed desire that individuals will clash and contend on the basis of their political ideas.

The Third Circuit's discussion of *Garcetti* strongly implies that the rationales for limiting public employee speech are not very relevant to elected officials:

> Many of the reasons for restrictions on employee speech appear to apply with much less force in the context of elected officials. Werkheiser's speech as an elected official is not subject to prior review or approval. To use *Garcetti's* language, his speech is neither "controlled" nor "created" in the same way that an employer controls the speech of a typical public employee. And, as the Supreme Court admonished, "[p]roper application of [its] precedents ... leads to the conclusion that the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities." *Id.* at 424, 126 S. Ct. 1951 (emphasis added). But of course, there is no truly comparable analog to "managerial discipline" when discussing retaliation between elected officials.
>
> And, because elected officials to a political body represent different constituencies, there would seem to be far less concern that they speak with one voice. In fact, debate and diversity of opinion among elected officials are often touted as positives in the public sphere. *See Bond*, 385 U.S. at 136–37, 87 S. Ct. 339 ("Legislators have an obligation to take positions on controversial political questions so that their constituents can be fully informed by them ... also, so [constituents] may be represented in governmental debates by the person they have elected to represent them.").

*Werkheiser*, 780 F.3d at 178 (citing *Bond v. Floyd*, 385 U.S. 116, 136-37 (1966)). Still, as *Werkheiser* noted, this issue is not settled.[5]

---

[5]      *Werkheiser,* although fairly clear about the Court's view of the issue, is nevertheless not a square holding as to whether *Garcetti* applies equally to public employees and elected officials. The actual issue before the court was whether elected

My own view is that *Garcetti* simply doesn't fit; in philosophical terms, to apply the *Garcetti* analysis to elected officials might be deemed a category mistake. An elected official enjoys the same First Amendment freedoms as any citizen. The question of what constitutes impermissible "retaliation," however, must be considered in light of the back-and-forth of the political process. Far from being immunized from the repercussions of political speech, an elected official can expect vigorous resistance from other political actors. That possibility would not deter a reasonable elected official from expressing his or her opinions.

Compare the case of an ordinary public employee. A clerk, for example, has a boss; she is expected to perform the job neutrally; she might be punished for politically haranguing a citizen who comes to her office to file a document. By the same token, a buildings commissioner might be prohibited from making official announcements discouraging applications for building permits. Even if he may privately harbor libertarian views that the costs of such regulations outweigh the benefits, he is expected to implement and not undermine the laws enacted by democratically elected officials. As to an elected official, however*,* the concept of managerial control simply has no application; likewise, the necessity of a politically neutral civil service does not come into play. An elected official may well disagree with and press for changes to existing laws and policies; indeed, she may have been elected for that very purpose. Nor can a legislator be prohibited from holding a minority political view; that represents the democratic process functioning as intended. In short, the *Garcetti* categories do not read very readily onto the situation of an elected councilwoman like Ms. Greenman. True, she may suffer consequences for

_____

officials were entitled to qualified immunity for a claim of retaliation against a fellow elected official based on his speech in that capacity. Qualified immunity was permitted because the right was not sufficiently established in the case law. *See generally Saucier v. Katz*, 533 U.S. 194, 201 (2001) (qualified immunity applies unless plaintiff demonstrates violation of a constitutional right and that the right was clearly established at the time of the misconduct).

political speech—but not because she is in some subordinate role, subject to the authority of her public employer.

An important function of the office of councilwoman is the monitoring of the City's finances. Can the City really be maintaining that Ms. Greenman can be prohibited from criticizing the perceived misuse of public funds precisely *because* she is a councilwoman? The answer, it seems to me, is that she cannot; but neither can she be insulated from the rough-and-tumble of electoral politics. Thus an elected councilperson may freely level criticisms, but cannot expect the criticized to take it lying down. No one should be surprised to hear that legislators will attempt to undermine rival legislators who hold different political views. Similarly, few would believe that a political party must, for example, award committee chairmanships on an equal basis to those who are hostile to its political program. Legislator A may speak in opposition to Legislator B's water project; Legislator B may respond by condemning Legislator A's welfare bill. In some colloquial sense, those opposing views, or votes, are retaliatory, but not in a First Amendment sense. Such ideological wars can be banned from the public workplace, but they are the very substance of electoral politics. They cannot be regarded as embodying forbidden viewpoint discrimination.

I add that in politics, as opposed to the workplace, retaliation tends to occur between relative peers. A councilperson is less subject to repression than an ordinary employee; she is not without recourse. What she can do is form governing coalitions, work against the reelection of rivals, or simply exercise her powers of persuasion. Ultimately, the voters will decide if, for example, she is correct that their tax dollars are not being used properly. The political process, and not the courts, would be the ultimate arena for settling such policy disagreements.

Considering those First Amendment principles in relation to a retaliation claim specifically, I conclude that engaging in protected expression does not clothe an elected official with immunity from subsequent actions contrary to his or her interests. Nor does a person, by speaking first, gain some sort of

17

first-to-file priority, *i.e.,* a right to preclude others from exercising their own First Amendment rights in response. As the Third Circuit observed in *Werkheiser, supra,* "[the defendants] may well have been exercising a competing First Amendment right to make a political statement by removing [Plaintiff]" based on disagreement with his views. *Werkheiser*, 780 F.3d at 178 (citing *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 545 (9th Cir. 2010)).

In short, "retaliation" cannot have the same meaning here that it does in the office environment of a public agency. *Blair* explained that elected board members are expected to engage in internal power struggles and "retaliate" against one another through oppositional voting; but "the First Amendment does not succor casualties of the regular functioning of the political process." *Id.* at 544-45 ("In fact, we expect political officials to cast votes in internal elections in a manner that is, technically speaking, retaliatory, *i.e.*, to vote against candidates whose views differ from their own."). Indeed, "nothing in *Bond* that suggests the Court intended for the First Amendment to guard against every form of political backlash that might arise out of the everyday squabbles of hardball politics." *Werkheiser*, 780 F.3d at 181.

"[M]ore is fair in electoral politics than in other contexts." *Blair*, 608 F.3d at 543. But perhaps not *all* is fair. Even in the context of elected office, there is a line to be drawn: "[T]he First Amendment may well prohibit retaliation against elected officials for speech pursuant to their official duties only when the retaliation *interferes with their ability to adequately perform their elected duties*." *Id.* (emphasis added). On that view, to be considered impermissible, such retaliation would have to cross the line to actual interference with the person's function as an elected official. When that occurs, the rules of the democratic political contest have been subverted, and it cannot no longer be presumed that the outcomes are legitimate.

The actual-interference standard builds on the holding of *Bond v. Floyd*, in which the U.S. Supreme Court held that the First Amendment rights of an elected official were violated when the Georgia House disqualified him from

18

taking his seat based on disagreement with statements he had made. 385 U.S. 116, 136-37 (1966). The Supreme Court noted that "[t]he manifest function of the First Amendment in a representative government requires that legislators must be given the widest latitude to express views on issues of policy. The central commitment of the First Amendment, as summarized in the opinion of the Court in *New York Times v. Sullivan*, 376 U.S. 254, 270, 84 S. Ct. 710, 721, 11 L. Ed. 2d 686 (1964), is that 'debate on public issues should be uninhibited, robust, and wide-open.'" *Bond*, 385 U.S. at 135-36. Thus the Supreme Court held that the elected officials' statements were protected because spirited, and often, bitter and strident opposition from political rivals in the public sphere was to be expected, and should be protected in the interests of the public, which needs to hear all sides of an issue. *Id.* Still, the form of opposition chosen by the Georgia legislature—plaintiff's exclusion from the position to which he had been elected—went so far as to have the opposite effect, actually precluding or stifling debate.

All of this is by way of saying that the classification of Ms. Greenman's role when she spoke at the meeting is, in summary judgment terms, a material one, in that it may determine which party is entitled to judgment as a matter of law. To simplify, the question of whether, why, and to what extent the plaintiff's statements merit First Amendment protection divides into three major scenarios:

(a) Plaintiff spoke as private citizen. (Statements are protected.)

(b) Plaintiff spoke as public employee. (First Amendment protection may be denied because, under *Garcetti*, such rights are limited in the setting of public employment.)

(c) Plaintiff spoke as elected official. (As I have held, *Garcetti* does not apply as such. Speech is protected, but "retaliation," to be impermissible, must rise to the level of interfering with plaintiff's functioning as an elected official.)

If Ms. Greenman is correct that she spoke as a private citizen, the legal distinctions between elected office and public employment become moot; her speech was protected from retaliation, indeed from even fairly minor forms of retaliation. If the defendants are correct that Ms. Greenman spoke as a public employee, then her speech on matters relating to her employment could properly be regarded as unprotected. Finally, if she spoke as an elected official, her speech was unfettered, but subject to political payback short of impairment of her functioning in her elected position.

I look ahead to state that, if Ms. Greenman spoke as a public official, it is an open question whether the alleged retaliation here—elimination of municipal health insurance benefits for elected councilpersons and recall from the library board—rose to the necessary level. The elimination of health insurance, which applied to all council members, may not have directly affected the exercise of any function of a councilperson. Ms. Greenman's position on the library board was not essential to her role as a council member; it was an ancillary, discretionary appointment by the mayor. For example, she was still able to serve on the finance and budget committees and vote on all measures. (Canestrino Dep. p. 69) These retaliatory acts, however galling or burdensome, did not—like the refusal to seat a legislator in *Bond*—disable Greenman from performing her duties as an elected council member. "[T]he First Amendment is not a shield against the vagaries of the political process, and it is only the political process where Plaintiff should look to for recourse in this action." *Werkheiser v. Pocono Twp.*, 210 F. Supp. 3d 633, 642 (M.D. Pa. 2016), *aff'd,* 704 F. App'x 156 (3d Cir. 2017).

The remaining question is whether the issue of Ms. Greenman's status, now shown to be legally significant, is genuine and factual. I conclude that it is. There is a clash of evidence as to whether Ms. Greenman—whether viewed as an elected official or a public employee—was speaking in *either* of those roles at the August 2014 DAC meeting, or whether she spoke as a private citizen.

As to which of these roles Ms. Greenman occupied when she spoke at the DCA meeting, the evidence is in conflict. Defendants contend that Ms.

Greenman's statements before the DCA finance board are self-evidently not those of a private citizen. Ms. Greenman, they point out, explicitly introduced herself at the hearing as a councilwoman. (DSOF ¶ 20; PRSOF ¶ 20; *see also* DE 146-3 (DCA transcript)) Her statements concerning the City's budget proposals were based on knowledge she had obtained through her work as a councilwoman. (DE 146-4 at 19) That context, in Defendants' view, establishes that Ms. Greenman spoke in furtherance of her official duty to represent the interests of her constituents. It follows from *Garcetti*, they say, that she did not enjoy the protection afforded to private expression, but rather is subject to the constraints on public employee speech that are imposed by *Garcetti*. (As I say, I disagree with the defendants' position that the *Garcetti* public employee analysis applies to an elected official. Here, however, I am discussing the factual issue of what Ms. Greenman's status was when she spoke at the meeting.)

Ms. Greenman responds that she was not at the DCA meeting in any official capacity, but spoke as a citizen. Ms. Greenman was not designated to represent the City of Hackensack before the DCA at that meeting; Ms. Canestrino was. (PSOF ¶ 12; Canestrino Dep. p. 121) Ms. Greenman thus had no duty to attend this meeting at all, and only did so as a concerned citizen.

The evidence is in conflict; resolution of the factual issue as to the capacity in which Ms. Greenman spoke is for the finder of fact.

### ii.  Causal Link

Assuming there was protected speech and an act that could be considered retaliatory, the remaining element of a First Amendment claim is that there be a causal link between the two. Here, too, there is an issue of fact that bars summary judgment.

The retaliatory behavior here is that the council voted to take away city-funded health insurance benefits from elected city officials and part-time city employees. Ms. Greenman also reports that she was removed from the library

board. Both actions, she alleges, were the result of her speaking at the DCA. Whether that is so presents a classic factual issue of causation.

The situation is complex. There is surely evidence that the defendants would have been displeased by Ms. Greenman's comments at the DCA meeting. As Ms. Greenman presents the facts, however, it appears that she clashed with defendants on many issues and on many bases—political, personal, ethnic, and religious. If retaliation for comments at a particular meeting is a possible hypothesis, it is far from a necessary one. Now the timing of the health-benefits resolution is suggestive; it came within days of the DCA meeting. Nevertheless, the cancellation applied across the board to all elected officials. Ms. Greenman says it affected her uniquely, because she did not have private insurance, while others did; nevertheless, this action on its face does not so uniquely target her that it can *only* be seen as retaliation. And the defendants must surely be permitted to argue that this was not revenge but good public policy, undertaken in furtherance of *their* public duties.

Ms. Greenman's removal as the mayor-appointed liaison to the library board occurred in October 2014, some two months after the DCA meeting. It, too, may have constituted retaliation for her comments at the DCA meeting. On the other hand, the Mayor might have decided, wisely or not, that she was no longer the right person for the job.

Accordingly, summary judgment is denied on Count 1.

### c. Counts 2 and 4 (CEPA, NJLAD)

CEPA was enacted to "protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct." *Abbamont v. Piscataway Twp. Bd. of Educ*, 138 N.J. 405, 431, 650 A.2d 958, 971 (1994). To effectuate that aim, the statute provides, in relevant part:

> An employer shall not take any retaliatory action against an employee because the employee … [d]iscloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer … that the employee reasonably believes … is in violation of a law.

N.J. Stat. Ann. § 34:19-3(a)(l). Under CEPA, an employee is an individual who performs services for and under the control and direction of an employer for wages or other remuneration. N.J. Stat. Ann. § 34:19-2(b). A retaliatory action is defined as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J. Stat. Ann. § 34:19-2(e).

To establish a cause of action for retaliation under CEPA, an employee must demonstrate four elements: (1) she had a reasonable belief that her employer's conduct violated a law, regulation, or clear mandate of public policy; (2) she performed a "whistle-blowing" activity under the act; (3) the employer took an adverse employment action against her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action. *Dzwonar v. McDevitt*, 828 A.2d 893, 900 (N.J. 2003); *Samowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 404 (3d Cir. 2007).

The NJLAD prohibits discrimination in the workplace based on "race, creed, color, national origin, ancestry, age, sex, affectional or sexual orientation, marital status, familial status, liability for service in the Armed Forces of the United States, or nationality." N.J. Stat. Ann. § 10:5-3. "[T]he LAD was intended to prohibit discrimination in the context of an employer/employee relationship," *Pukowsky v. Caruso*, 312 N.J.Super. 171, 184 (N.J. Super. Ct. App. Div. 1998), and that the absence of an employment relationship between a plaintiff and a defendant will preclude liability. *Thomas v. Cnty. of Camden*, 386 N.J. Super. 582, 594 (N.J. Super. Ct. App. Div. 2006). "Employer" under the NJLAD "includes the State, any political or civil subdivision thereof, and all public officers, agencies, boards, or bodies." N.J. Stat. Ann. § 10:5-5(e). "Employee" is not defined, except negatively; it "does not include any individual employed in the domestic service of any person" *Id.* § 10:5-5(f).

To succeed on an NJLAD claim, a plaintiff must establish that "1) she belongs to a protected class; 2) she was qualified for the position; 3) she was

subject to an adverse employment action; and 4) the adverse action (occurred] under circumstances giving rise to an inference of discrimination." *Shahin v. Delaware*, 424 F. App'x 90, 92–93 (3d Cir. 2011); *see also Tourtellotte*, 636 F. App'x at 842 (citing *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410–11 (3d Cir. 1999); *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 n. 6, (1981)). "In order to constitute adverse employment action for purposes of the LAD, retaliatory conduct must affect adversely the terms, conditions, or privileges of the plaintiff's employment or limit, segregate, or classify the plaintiff in a way which would tend to deprive her of employment opportunities or otherwise affect her status as an employee." *Marrero v. Camden Cnty. Bd. of Soc. Servs.*, 164 F. Supp.2d 455, 473 (D.N.J. 2001). It is well settled that "the LAD is intended to be New Jersey's remedy for unacceptable discrimination and is to be liberally construed." *Franek v. Tomahawk Lake Resort*, 333 N.J. Super. 206, 217 (N.J. Super. Ct. App. Div. 2000). *See also Cedeno v. Montclair State Univ.*, 163 N.J. 473, 478 (2000) (recognizing "the important public policies of the LAD ... and the need to construe [it] liberally to achieve those policies").[6]

### i. "Employee Status"

Defendants' summary judgment motion as to the CEPA and NJLAD primarily argues that Ms. Greenman is not an "employee" of the City. Faced with the same arguments at the motion to dismiss stage, I stated:

> Relevant factors under CEPA, developed in the context of independent contractors, include
>
> > (1) the employer's right to control the means and manner of the worker's performance; (2) the kind of occupation— supervised or unsupervised; (3) skill; (4) who furnishes the equipment and workplace; (5) the length of time in which the individual has worked; (6) the method of payment; (7) the manner of termination of the work relationship; (8) whether

---

[6]     A word about the concepts of "employee" and "adverse action." They overlap, but do not coincide, with the First Amendment concepts, discussed above, of "public employment" and "retaliation." Whether an elected official is treated as a public employee under *Garcetti* is dictated by First Amendment policies, not agency law. And depending on the context, First Amendment "retaliation" may encompass acts that could not be described as an "adverse employment action" under CEPA or NJLAD.

> there is annual leave; (9) whether the work is an integral part of the business of the "employer;" (10) whether the worker accrues retirement benefits; (11) whether the "employer" pays social security taxes; and (12) the intention of the parties.
>
> *D'Annunzio v. Prudential Ins. Co. of Am.*, 927 A.2d 113, 121 (N.J. 2007) (quoting *Pukowsky v. Caruso*, 711 A.2d 398, 404 (N.J. Super. App. Div. 1998) (quoting *Franz v. Raymond Eisenhardt & Sons, Inc.*, 732 F.Supp. 521, 528 (D.N.J. 1990))). Other and different considerations have been applied to persons who are shareholder-directors in a business organization, because their status may render them less susceptible to intimidation. *See Feldman v. Hunterdon Radiological Associates*, 901 A.2d 322 (N.J. 2006).
>
> NJLAD does not contain a general definition of "employee," although it does exclude "any individual employed in the domestic service of any person." N.J. Stat. Ann. § 10:5-5(f). Like CEPA, however, NJLAD is broad, remedial legislation, and the flexible *Pukowski* test has been applied in the NJLAD context as well. *Feldman*, 901 A.2d at 331. That test, however, requires a factual context.

(DE 44 at 3-4) As these multiple factors make clear, the analysis for determining whether an individual is an employee for CEPA and NJLAD purposes is inherently factual. Factor 1, the "right to control" has been held to be the most important factor. *See Chrisanthis v. County of Atl.*, 361 N.J. Super. 448, 455, (N.J. Super. Ct. App. Div. 2003). However "[o]ur courts have long recognized that, in certain settings, exclusive reliance on a traditional right-to-control test to identify who is an 'employee' does not necessarily result in the identification of all those workers that social legislation seeks to reach." *D'Annunzio*, 192 N.J. at 121.

Factor 1, the right of the City to control the manner of Ms. Greenman's employment, is inconclusive. On the one hand, a reasonable jury could agree with Defendants that the City did not control Ms. Greenman in the sense that it hired her or could fire her from her elected position. Only the citizens of Hackensack could do that. Moreover, she did not have a supervisor who controlled or directed her work. On the other hand, through its personnel policies, the City did exercise a level of control over Ms. Greenman's work. For

example, upon taking office she was provided an employee handbook which stated that "as a city employee, you have certain rights and obligations" and outlined the policies that governed "discrimination, safety, violence, harassment, and conflicts of interest" issues. (DE 150-5 at 3)[7]

Factor 2, the kind of occupation and whether it is supervised, favors a finding that Ms. Greenman was not an employee of the City. Again, she did not have a supervisor who selected or dictated her duties. Ms. Greenman's agenda was largely dictated by herself and the requirements of her constituents as she perceived them.

Factor 4, responsibility for the equipment and workplace, favors a finding that Ms. Greenman is an employee. Her work, or at least the formal part of it, took place at the City's municipal offices.

Certain factors, such as (3) skill, and (5) length of time on the job, are frankly not much help. Any particular elected office, such as councilperson, has uniform duties and responsibilities. Persons elected to that office surely exercise varying degrees of skill in exercising judgment, politicking, consensus building, and the like. I, however, find it difficult to discern how these skills correlate to a finding of "employee." Likewise, a councilwoman's tenure is determined by the electorate, subject to any term limits.

The analysis of factor 7, the manner of terminating the work relationship, is the same as factor 2. The only way Ms. Greenman could be formally

---

[7]      Defendants contend that Title VII as a matter of law compels a finding that Ms. Greenman as an elected official is *not* an employee for NJLAD purposes because the NJLAD and Title VII are construed similarly. *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 842 (3d Cir. 2016) ("This Court's discrimination inquiry is the same for claims filed under Title VII and the NJLAD ....") (citing *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 249 (3d Cir. 2006)). In this respect, I disagree with Defendants.

Under Title VII, "[t]he term 'employee' means an individual employed by an employer, except that the term 'employee' shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof." 42 U.S.C. § 2000e(f) (emphasis added). Thus, Title VII specifically excludes elected official from the definition of employee. The NJLAD does not contain that limitation. Absent any other factors, I am reluctant to read into the statute a limitation that the New Jersey legislature declined to include.

terminated was to resign, allow her term to expire, or lose an election. The City did not control "hiring" or "firing," to the extent those concepts apply at all.

Factors 6 (method of payment), 8 (leave), 10 (retirement benefits), and 11 (social security taxes) favor a finding that Ms. Greenman was an employee. Ms. Greenman's salary emanated from the City payroll, she contributed to the City's pension fund, and retirement benefits and taxes were deducted from her paycheck. (DE 150-6) The Hackensack employee manual further outlined leave policies which applied equally to Ms. Greenman (for example, as a part-time employee she would have been entitled to two personal days per year). (DE 150-5 at 27) Until November 1, 2014, Ms. Greenman was provided health insurance through the City of Hackensack. (DE 150-18) These factors favor a finding that Ms. Greenman was an employee. *See Isetts v. Borough of Roseland*, No. ESX-L-2480-02, 2005 WL 2334363, at *14 (N.J. Super. Ct. Sept. 22, 2005) ("While the method of payment, the employee benefits, and the pension plan status, on the other hand, might seem to point to Isetts being an employee . . . ."). I observe, however, that none of this *necessarily* implies that council members were, or were treated as, employees. It could reflect nothing more than the city's efficiency-based decision to use a system already conveniently in place, rather than develop a whole separate system for the council members.

Factor (9)—whether the work is an integral part of the business of the "employer"— favors a finding that Ms. Greenman was an employee. The City leaves governing to its council members and tasks them with implementing the policies that will keep the City running.

Finally, factor 12, the parties' expectations, is inconclusive. Ms. Greenman believed she was covered by the City's policies as outlined in the paperwork she received when elected. She did, in fact, avail herself of the protections of those policies by seeking the assistance of the City's attorney in investigating her discrimination claim. (DE 150-7) "Although employee expectations are not dispositive of employer status, they are relevant to our analysis." *Graves v. Lowery*, 117 F.3d 723, 728–29 (3d Cir. 1997) (citing *Armbruster v. Quinn*, 711 F.2d 1332, 1337 (6th Cir. 1983) ("[T]he most

27

important requirement is that there be sufficient indicia of an interrelationship
… to justify the belief on the part of an aggrieved employee that the [alleged co-
employer] is jointly responsible for the acts of the immediate employer.")).
However, the City argues that it had the exact opposite expectation in that Ms.
Greenman was answerable to the voters, not to them.

Ultimately, a jury could find the facts in a way that compels a finding
that Ms. Greenman was not an employee for CEPA and NJLAD purposes. Ms.
Greenman was not hired by the City in the traditional sense, was not
"controlled" by a specific boss, and could not be hired or fired by the City.
These considerations are significant. Nevertheless, a jury could also find the
facts in a way that compels the opposite conclusion. She was covered by the
City's personnel policies on the same basis as more traditional employees, was
told that she was a City employee, received an employee handbook, was paid
by the City payroll department, enjoyed employee benefits, and used the City's
administrative procedures for investigation of her harassment allegations—all
indicia of employee status. *See Graves*, 117 F.3d 723 at 729. "In sum, the
precise contours of an employment relationship can only be established by a
careful factual inquiry." *Id.*

Accordingly, material factual disputes remain as to whether Ms.
Greenman was an "employee." If that were the only element, I would be
constrained to deny summary judgment. But it is not, and I will grant
summary judgment based on plaintiff's failure to establish an adverse
employment action.

### ii.  "Adverse Employment Action"

Under both CEPA and the NJLAD, Plaintiff must establish that she was
subjected to an adverse employment action. An adverse employment action is
defined similarly for purposes of Title VII and NJLAD. *Marrero v. Camden Cnty.*
*Bd. of Soc. Servs.*, 164 F. Supp.2d 455, 473 (D.N.J. 2001) "In order to
constitute adverse employment action for purposes of the LAD, retaliatory
conduct must affect adversely the terms, conditions, or privileges of the

plaintiff's employment or limit, segregate, or classify the plaintiff in a way which would tend to deprive her of employment opportunities or otherwise affect her status as an employee." *Id.* (quoting *Hurley v. Atlantic City Police Department*, No. 96-4928, 1998 WL 351781, at \*12 (D.N.J. May 28, 1998)).

Thus, to satisfy the NJLAD, the adverse actions cannot be "minor slights like 'negative comments,'" but must be "serious and tangible" such that they "constitute a change in the employee's 'terms, conditions, or privileges' of employment." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1299 (3d Cir. 1997), *abrogated by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405 (2006).

A "retaliatory action" for purposes of CEPA is similarly defined and "means the discharge, suspension, or demotion of an employee, or other adverse employment action taken against an employee in terms and conditions of employment." N.J. Stat. Ann. § 34:19-2(e). Interpreting that language, some courts have held that the employer's action must affect the employee's compensation or rank, or "be virtually equivalent to discharge." *Klein v. Univ. of Med. & Dentistry of New Jersey*, 871 A.2d 681, 691 (N.J. Super. Ct. App. Div. 2005); *see also Caver v. City of Trenton*, 420 F.3d 243, 249 (3d Cir. 2005). Other decisions, with which I agree, have taken a somewhat broader view, but still require a change to the conditions of employment. Examples of actionable retaliatory acts have included suspensions, demotions, changes to the length of the workday, changes in salary, hours, fringe benefits, or "physical arrangements and facilities," and altered "promotional procedures." *Beasley v. Passaic County*, 873 A.2d 673, 685-86 (N.J. Super. Ct. App. Div. 2005); *see also Smith v. Twp. Of E. Greenwich*, 519 F. Supp. 2d 493, 511 (D.N.J. 2007) *aff'd*, 344 F. App'x 740 (3d Cir. 2009), *as amended* Nov. 3, 2009 (quoting same language).

Even assuming that Ms. Greenman was an employee, and construing the facts in her favor, I find no sufficient evidence that she was subjected to an adverse employment action. In her telling, defendants used language that was

prejudiced and boorish. They opposed some of her budgetary and other positions, and voted contrary to her preferences. Those circumstances, however, unpleasant, are not inconsistent with her functioning in the job of councilwoman. An ancillary appointment as liaison to the library board is no integral part of employment as councilwoman, but a discretionary mayoral appointment; if denied in the first place, or taken away, it would not alter the conditions of employment. The only allegation that even facially resembles an adverse employment action is the cancellation of health benefits. That policy, however, applied to *all* councilpersons, elected officials, and part-time employees. It cannot have negated the functions of the position of councilperson, because it was a condition of employment for all elected officials.

Defendant's alleged behavior, assuming it occurred, was obnoxious, cruel, and un-American. It did not, however, affect Ms. Greenman's compensation, her terms of employment, or her ability to discharge the functions of a councilperson. *A fortiori,* it was not "virtually equivalent to discharge."

Accordingly, summary judgment is granted for defendants on Counts 2 and 4, which are dismissed.

### d. Count 3: Section 1983/Equal protection

Plaintiff's remaining claim under Count 3 asserts a claim under 42 U.S.C. § 1983 for the violation of her right to equal protection. The Fourteenth Amendment to the U.S. Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1.

### i. Absolute Legislative Immunity

Defendants first argue that Labrosse and Canestrino cannot be held liable for violations of Plaintiff's equal protection rights because they enjoy absolute legislative immunity. (DE 146-4 at 31)

Absolute legislative immunity applies to official actions taken within the scope of legitimate legislative activity. *Schlegel v. Koteski*, 307 Fed.Appx. 657 (3d Cir. 2009) (citing *Bogan v. Scott–Harris*, 523 U.S. 44, 54, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998)). The Third Circuit has held that absolute legislative immunity extends to "members of a municipal council acting in a legislative capacity." *Aitchison v. Raffiani*, 708 F.2d 96, 99 (3d Cir. 1983). Assuming the acts complained of are legislative in nature, absolute immunity applies to actions brought against the individual defendants in their individual capacities. *Id.* at 100. However, legislative immunity does not bar Section 1983 suits against municipal committee members in their official capacities. This is because Section 1983 claims against city council members in their official capacities are "in all respects other than name, to be treated as a suit against the entity." *Bass v. Attardi*, 868 F.2d 45, 51 (3d Cir. 1989) (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). The "entity," in this case, is the City of Hackensack. Thus the City and the individual defendants in their official capacities are not entitled to absolute legislative immunity. *Id. See also Aitchison*, 708 F.2d at 100 ("liability against the municipality is not precluded.").

Even as to defendants in their individual capacities, however, immunity does not apply unless the acts in question were both substantively and procedurally legislative. *In re Montgomery Cty.*, 215 F.3d 367, 376 (3d Cir. 2000). An act is substantively legislative where it involves "policy-making of a general purpose" or "line-drawing." *Id.* An act is procedurally legislative if it is undertaken "by means of established legislative procedures." *Id.* For example, the "'acts of voting for an ordinance were, in form, quintessentially legislative,' as were all 'integral steps in the legislative process.'" *Brown v. City of Bordentown*, 348 N.J. Super. 143, 148 (N.J. Super. Ct. App. Div. 2002) (internal citations omitted). However, "employment actions taken with respect to specific employees do not constitute substantively legislative conduct." *Ballas v. City of Reading*, No. 00–CV–2943, 2001 WL 359817 (E.D.Pa. April 3,

31

2001). Likewise, "an official's executive or administrative actions are separable from actions taken in a legislative capacity." *Carver v. Foerster*, 102 F.3d 96, 101 (3d Cir. 1996) (citing *Meding v. Hurd*, 607 F.Supp. 1088, 1110 n. 28 (D.Del. 1985) (actions of Town Council in terminating the police chief are not legislative merely because termination was achieved by a vote of the council)).

Insofar as it is based on the resolution canceling health insurance benefits for all elected officials, Ms. Greenman's claim cannot overcome the bar of legislative immunity. The cancellation consisted of a resolution proposed by a council member, voted on, and adopted by the council. It is legislative in nature. *Montgomery.*, 215 F.3d at 376.

However, the remaining alleged discriminatory acts—the ethnic and religious insults, the removal from the library board, and so on—are not legislative. They do not involve "policy-making of a general purpose" or acts taken as part of the legislative process. Therefore, Labrosse and Canestrino (and of course the City) do not enjoy absolute legislative immunity with respect to those acts.

### ii.  Merits of the Equal Protection Claim

I turn to the merits of the equal protection claim. Ms. Greenman asserts a claim of unequal application of the laws on the basis of her race, religion, and national origin.

"[T]he Constitution prohibits selective enforcement of the law based on considerations such as race.... [T]he constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause." *Whren v. United States*, 517 U.S. 806, 813 (1996). Ordinarily, to state a claim for an equal protection violation, a plaintiff must allege that "(1) she is a member of a protected class; (2) that she was treated differently from similarly situated individuals; and (3) that this disparate treatment was based on her membership in the protected class." *Knox v. Union Twp. Bd. of Educ.*, No. 13-5875, 2015 WL 769930, at *13 (D.N.J. Feb. 23, 2015). Here, Ms. Greenman's ethnicity "must have been a substantial factor" in the allegedly different

treatment that she received from defendants. *Hassan v. City of New York*, 804 F.3d 277, 294 (3d Cir. 2015).

Here, Ms. Greenman asserts that she was subjected to a hostile work environment. Courts have adopted Title VII's hostile work environment framework in the context of equal protection discrimination claims brought under § 1983. *Holt v. Pa.*, 683 F. App'x 151, 160 (3d Cir. 2017) ("And because of the overlap between Title VII claims and constitutional discrimination claims, we have applied Title VII caselaw to equal protection claims."); *Rayfield v. City of Paterson*, No. 17-5144, 2018 WL 2859528, at *7 (D.N.J. June 11, 2018); *Harley v. City of N.J. City*, No. 16-5135, 2017 WL 2779466, at *4 (D.N.J. June 27, 2017) (applying Title VII elements to § 1983 and § 1981 claims); *Hailey v. City of Camden*, 650 F. Supp. 2d 349, 354 (D.N.J. 2009) (same); *Hurley v. Atl. City Police Dep't*, No. 93-260, 1995 WL 854478, at *10 (D.N.J. Aug. 4, 1995), *aff'd*, 174 F.3d 95 (3d Cir. 1999) (stating the § 1983 "inquiry here mirrors that with regard to the Title VII claims").

Therefore, to establish a hostile work environment claim under the Fourteenth Amendment a plaintiff must also prove "(1) that he or she suffered intentional discrimination because of race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) a basis for personal liability." *Rayfield*, 2018 WL 2859528, at *7; *Ugorji v. N.J. Envtl. Infrastructure Tr.*, No. 12–5426, 2014 WL 2111076, at *5 (D.N.J. June 19, 2014).

First, plaintiff has adequately established that she is a member of a protected religious class in that she is Jewish. *Al–Khazraji, v. Saint Francis College*, 784 F.2d 505, 517 (3d Cir.1986) (finding that § 1981 applied to an "Arab" plaintiff, and noting that it does not apply only to a narrow definition of "race": "Discrimination based on race seems, at a minimum, to involve discrimination directed against an individual because he or she is genetically part of an ethnically and physiognomically distinctive sub-grouping of homo

sapiens."); *Weber v. Rutgers*, No. CV 06-3734 (FSH), 2008 WL 11381939, at *2 (D.N.J. Aug. 6, 2008) ("Plaintiff is Jewish, which has been recognized as a protected class."). Her claim may also be viewed as one based on her foreign ethnicity.

The issue here breaks down when assessing the discriminatory conduct alleged. Ms. Greenman has alleged that Defendants made the following comments: Mr. Labrosse (1) told her she was not a real Hackensackian or a real American; (2) stated that he was going to make her life miserable; (3) initially refused to allow her to have a rabbi at her swearing in ceremony; (4) once told her that he attributed the failure of his fish business to Jews failing to patronize his shop; and (5) mocked her accent by asking if she understood English. (Greenman Dep. pp. 55-56, 74-75, 79-83, 91) Ms. Greenman asserts that Ms. Canestrino asked Plaintiff if she was "afraid to be in a church?" and then stated that Plaintiff could not undergo the sacrament because "the holy water will make you fizzle and melt into a puddle of scum." (*Id.* p. 74, 109-10, 167-68) On a different occasion, Ms. Canestrino is alleged to have complained about her physician's Hanukah decorations. (*Id.*) Ms. Greenman also believes the Mayor's withdrawal of her appointment to the library board was ethnically or religiously motivated.

All of these comments, Ms. Greenman asserts, amount to severe and pervasive behavior motivated by racial animus that negatively impacted her work. A line must be drawn between mere offensive language and the creation of a pervasively hostile work environment. A "recurring point" in case law in this area "is that 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.' These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citations omitted).

On one view of the facts, the defendants went beyond the mere making of the occasional offensive remark. As Ms. Greenman portrays it, the religious or

ethnic abuse was repeated and regular. A finder of fact could find that Ms. Greenman was subjected to disparate treatment based on her religion and ethnicity, in that the abusive acts attributed to defendants could plausibly have had their basis in religious or ethnic prejudice. To be sure, a juror could also remain unconvinced. Ms. Greenman alleges that Labrosse clung to a sense of injury at the hands of Jews and threatened to make her life miserable. Labrosse, on the other hand, proffers that he was predicting, not threatening, a "miserable" experience as a councilwoman if Ms. Greenman did not get with his political program. On this motion for summary judgment, I am required to draw inferences in plaintiff's favor.

Accordingly, Defendants' motion for summary judgment on Count 3 is denied.

### e.  Count 8: NJCRA Claim

Count 8 alleges under the NJCRA the same violations that are alleged under § 1983 in Counts 1 and 3. The NJCRA, N.J. Stat. Ann. § 10:6-2(c), provides that "[a]ny person who has been deprived of any substantive rights, privileges or immunities secured by the Constitution or laws of this State by a person acting under color of law, may bring a civil action for damages."

The NJCRA "was modeled after 42 U.S.C. § 1983, and creates a private cause of action for violations of civil rights secured under the New Jersey Constitution[ ]." *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443 (D.N.J. 2011). "This district has repeatedly interpreted NJCRA analogously to § 1983." *Id.* (collecting cases); *see also RaCapt. Mos v. Flowers*, 429 N.J. Super. 13, 23 (N.J. Super. Ct. App. Div. 2012) (stating that NJCRA was "modeled on the federal civil rights law which provides for a civil action for deprivation of civil rights." (citations omitted)) *Ingram v. Twp. of Deptford*, 911 F. Supp. 2d 289, 298 (D.N.J. 2012). Thus, the NJCRA is construed nearly identically to Section 1983.

The parties have not suggested any distinction between the Count 8 claims under NJCRA and their Count 1 and 3 counterparts under 42 U.S.C. §

1983. Therefore, for the reasons outlined in Sections II.b and II.d, *supra*, Defendant's motion for summary judgment is denied as to Count 8.

### III.   Conclusion

For the foregoing reasons, the motions are decided as follows.

Defendants' first motion for summary judgment (DE 146) is **GRANTED IN PART AND DENIED IN PART**. Summary judgment is **DENIED** as to Counts 1, 3 (equal protection), and 8. Summary judgment is **GRANTED** as to Counts 2, 3 (due process) and 4, which are dismissed.

Defendants' second motion for summary judgment (DE 148), which is directed to the state law tort claims, Counts 5, 6, and 7, is **GRANTED ON CONSENT** in its entirety. Those counts are dismissed.

An appropriate order follows.

Dated: September 12, 2020

/s/ Kevin McNulty

_____

**Kevin McNulty**
**United States District Judge**