**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **ROSE GREENMAN,** | Civ. No. 15-3274 (KM)(MAH) |
| **Plaintiff,** | |
| **v.** | **OPINION** |
| **CITY OF HACKENSACK, et al.,** | |
| **Defendants.** | |

**KEVIN MCNULTY, U.S.D.J.:**

This matter arises from the May 12, 2015 civil rights action of Plaintiff Rose Greenman, a former elected city council member of the City of Hackensack against Hackensack; Mayor John Labrosse; Deputy Mayor Kathleen Canestrino; Richard Salkin, former council member and legal counsel for the City Board of Education; Art Koster, City personnel director and acting City manager; and Albert Borelli, zoning officer. Pertinent to this motion, on September 12, 2020, I denied the summary judgment motion of Defendants Hackensack, Labrosse, and Canestrino with respect to Plaintiff's First Amendment claim and equal protection claim, and the state counterpart of those claims. Those Defendants now seek reconsideration.

For the reasons provided herein I will deny in part and grant in part Defendants' motion. I will deny the motion with respect to Plaintiff's First Amendment claims. With respect to Plaintiff's equal protection claims, I will grant Defendants' motion only to the extent of holding that Plaintiff failed to establish municipal liability on part of Defendant Hackensack. The equal protection claims against individual defendants Labrosse and Canestrino stand. Defendants' motion in all other aspects is denied.

1

I.      **Summary**[1]

I write primarily for the parties and assume familiarity with the matter. For convenience, I reproduce from my prior Opinion certain facts pertinent to this motion:

> In 1972, Ms. Greenman immigrated to the United States from the former Soviet Union, and in 2007 she became a United States citizen. (DSOF ¶ 2) She is Jewish, a fact relevant to her claims in this action. (Id.)

> In 2013, Ms. Greenman was elected to the City of Hackensack's Council, and served in that capacity from July 1, 2013 until she resigned on March 31, 2015. (DSOF ¶ 1) Ms. Greenman ran on the same ticket and ultimately served on the council with members, John Labrosse (Mayor), Kathleen Canestrino (Deputy Mayor), Leonardo Battaglia, and David Sims, all of whom ran as the "Hackensack First" party. (Id. ¶¶ 4, 6)

> When elected, Ms. Greenman received a new employee packet from the City that included a welcome letter titled "Welcome to Employment with the City of Hackensack." (PSOF ¶ 2; DE 150-5) Ms. Greenman also received an employee handbook that outlined Ms. Greenman's "rights and obligations" as "a City employee." (DE 150-5 at 3) Included in the handbook was the City's anti-harassment policy. (Id. ¶ 3) It is undisputed that Ms. Greenman was paid a regular salary and received employee benefits, such as counseling, retirement benefits, and health insurance. (Id. ¶¶ 4-5; Labrosse Dep. p. 13 (admitting City invested a portion of his paycheck into a City run pension fund))

> Hackensack "has a Council-Manager form of government pursuant to N.J.S.A. 40:79-1 et seq. (Municipal Manager Act of 1923). In this form of government, the Manager is the chief executive and administrative official of the municipality." (DSOF ¶ 3) Council members serve four-year terms and exercise legislative

---

[1]      Citations to the record will be abbreviated as follows. Citations to page numbers refer to the page numbers assigned through the Electronic Court Filing system, unless otherwise indicated:

"DE" = Docket entry number in this case.

and policy power over the City, including selecting the Mayor, and, adds Plaintiff, the Council "may investigate the administration, may determine internal organization and may create and abolish boards and organizations … [and the] Mayor shall make appointments to the Library Board." (Id.; PRSOF ¶ 3)

While serving on the council, Ms. Greenman was appointed by the Mayor to be his liaison to the library board and attended most library board meetings. (DSOF ¶¶ 8, 10; DE 146-3 at 320) She was also a member of the finance and budget committees without having been appointed by Labrosse. (DE 150-4 ("Canestrino Dep.") p. 69)

Ms. Greenman asserts that council members made numerous statements to her concerning her religion and ethnicity. As to Mr. Labrosse, Ms. Greenman testified that he told her she was not a real Hackensackian or a real American and he was going to make her life miserable, that he initially refused to allow her to have a rabbi at her swearing-in ceremony, that he once told her that he attributed the failure of his fish business to the Jews in the area not supporting his business because the fish was not kosher, and that he mocked her accent by asking if she understood English. (Greenman Dep. pp. 55-56, 74-75, 79-83, 91) Mr. Labrosse mostly denied these allegations. He admits, however, telling Ms. Greenman she was not a real Hackensackian and that if she did not cooperate with the council, her life would be a nightmare. (Labrosse Dep. pp. 139-141) These, comments, he says, were simply part of an effort to help Ms. Greenman understand the importance of not trying to go in a different direction from the rest of the council. (Id.) Mr. Labrosse also admitted to asking Ms. Greenman whether she understood English; this, he said, was not an expression of disrespect but a bit of sarcasm after he having to repeat himself several times when speaking to her. (Id. pp. 144-45)

Ms. Greenman asserts that Ms. Canestrino also made statements about her race and ethnicity. For example, at a 2013 church event, Greenman testified that Canestrino asked Plaintiff if she was "afraid to be in a church" and then stated that she could not undergo the sacrament because "the holy water will make you fizzle and melt into a puddle of scum." (Greenman Dep. p. 74, 109-10, 167-68) On a different occasion, Ms. Greenman stated that Ms. Canestrino complained about her physician's holiday decorations, stating "Who cares about Hanukah?" Plaintiff also contends that

3

numerous insulting messages have been posted to online forums and she believes that Canestrino is the individual responsible for these messages. A June 20, 2014 posting entitled "Rosie Girl" was posted by someone under the name "Ethel Rosenberg." (Greenman Dep. p. 171) Ms. Greenman confronted Ms. Canestrino because the posting contained information that Greenman had provided to Canestrino her at an earlier meeting. (Id. pp. 171-72) Ms. Greenman testified that Canestrino laughed off the accusation, stating that it was not her, but that she knew enough people who could post this for her. (Id.) Canestrino denies all of these claims. (Canestrino Dep. p. 154-55, 157)

During the summer of 2014, the council was in the process of renegotiating a collective bargaining agreement with the police and a formulating a revised budget. (PSOF ¶ 8) Ms. Greenman was at odds with the rest of the council, and she publicly and repeatedly voiced concerns about the increases in salary demanded by the police. As a result, when speaking at council meetings she was frequently booed and interrupted by police officers who were in attendance. (Id. ¶ 9; DE 150-7)

On July 21, 2014, Ms. Greenman emailed the City of Hackensack attorney asking for an investigation: "I would like, yet again, to bring to your attention the illegal conduct of Mayor Labrosse, Deputy Mayor Canestrino and Police Director Mordaga.... On numerous occasions Mayor Labrosse threatened and intimidated me for standing up to his illegal behavior by using racist and anti-Semitic language that referenced my national origin, my ethnicity and my accent." (DE 150-7) Ms. Greenman also raised in this letter that Canestrino was attempting to intimidate and retaliate against her for speaking out by threatening to take away her health insurance. (Id.) Ms. Greenman asked that her claims be investigated. (Id.) Labrosse was aware that Ms. Greenman requested that her allegations be investigated. (Labrosse Dep. p. 72) Ms. Greenman's complaints were never investigated. (PSOF ¶ 22; DE 150-16 at 2-3)

Following this complaint, on "August 7, 2014, Plaintiff received a notice from the City's Zoning Department that there was a complaint that Plaintiff was using her apartment as a law office in violation of the City's zoning ordinance." (DSOF ¶ 17) Defendant Salkin, a former council member, was the one who filed the complaint. Plaintiff refused to permit the City's zoning officer,

4

Albert Borelli, to inspect her apartment because he did not have a
warrant to do so. (Id. ¶ 18)

On August 13, 2014, the local finance board of the
Department of Community Affairs ("DCA") held a public meeting.
(DE 146-3 (DCA transcript) at 122-309) Canestrino, the mayor's
designated appointee to present at the meeting, discussed the
City's plan to finance the funding of settlements of tax appeals that
had accumulated against the City. (Id. at 218-229) Canestrino
represented that she was presenting on behalf of the mayor and
the rest of the council. (Id. at 223) At the same meeting, the
subject of health benefits for council members was raised, and it
was noted that only one unnamed council member received health
benefits. (Id. at 232-33) Ms. Greenman attended the meeting.
(PSOF ¶ 13) Ms. Canestrino testified that "Plaintiff was not invited
to be a delegate at the meeting" and that she was not appointed to
attend the meeting. (PSOF ¶ 12; Canestrino Dep. p. 121)

During the public comment portion of the meeting, Ms.
Greenman and two other residents of Hackensack spoke to the
board to raise concerns about the new police contract that the
Council had passed. They alleged that the City was
misappropriating funds. (DSOF ¶ 21) Ms. Greenman introduced
herself and explained that she was a city council member. (DSOF ¶
20; PRSOF ¶ 20). In particular, she let it be known that the council
had approved the new police contract without examining it;
therefore, she objected to the way the council negotiated the
contract and objected to obtaining a loan to pay for the contract.
(Id. at 234-248 ("The rest of the council would not be interested in
it. How can you vote for something without ever having to eyeball
it? ... there must be an oversight. I cannot alone by myself control
it if the people are not telling the truth."); (DSOF ¶¶ 22-26))

On August 15, 2014, criminal charges were brought against
Ms. Greenman based on her failure to allow inspection of her
apartment. (DSOF ¶ 29)

On August 18, 2014, Canestrino introduced Resolution No.
300-14. (DE 146-3 at 28-29) The resolution prohibited Hackensack
elected city officials and part-time city employees from receiving
city-funded health insurance benefits as of November 1, 2014. (Id.)
Defendants point to the fact that the DCA lists excluding
healthcare coverage for appointed officials in their "best practice"

5

worksheet. (DSOF ¶ 28) Plaintiff notes that this had been a best practice for years but had only been brought to a resolution once Plaintiff spoke out at the DCA meeting. (PRSOF ¶ 28) Ultimately, Battaglia, Canestrino, Sims, and Labrosse all voted in favor of the resolution; Greenman was the only "no" vote. (Id.) Ms. Greenman was the only council member who relied on the City's healthcare insurance. (PSOF ¶ 15)

At some point thereafter, Canestrino and Greenman discussed issues concerning the library board. According to Canestrino, she indicated to Plaintiff that the library board was having difficulty communicating with Plaintiff and that the council was unhappy with her attendance at library board meetings. (DSOF ¶¶ 34-35) Greenman contests Canestrino's account, stating that Canestrino said that her English was not sufficiently proficient to communicate with the library board. (DSOF ¶ 36) In any event, Greenman states, this issue was manufactured by the council; the library board director, Sharon Constantine, testified that no library board members had ever complained that they could not communicate with Ms. Greenman or taken issue with her performance on the board. (PSOF ¶ 18; see also DE 150-13 (Constantine Dep.) pp. 50-53) Greenman requested an explanation in writing from the mayor for her removal from the library board, which was never provided. (PSOF ¶ 19)

In October 2014, the council removed Greenman from the library board. (Id. ¶ 37)

On January 6, 2015, former council member Salkin spoke at a public meeting. (DSOF ¶ 39) Salkin complained about Ms. Greenman and her potential zoning ordinance violations and read a poem in which he called Ms. Greenman a "sociopath." (Id. ¶¶ 39-40) On January 8, 2015, the charges against Ms. Greenman were dropped because the city's zoning officer did not have a warrant and therefore Ms. Greenman was within her rights to refuse to allow the officer to search her home. (Id. ¶ 41)

On March 31, 2015, Ms. Greenman resigned "due to the discrimination based on race, religion, and national origin which I have faced, as well as the retaliation that I have faced after I spoke out as a citizen as to matters of public concern." (PSOF ¶ 23; DE 150-17)

(DE 156 at 2-7).

On May 12, 2015, Plaintiff initiated this action. The causes of action originally asserted in the Complaint were as follows:

**Count 1** — First Amendment Retaliation (42 U.S.C. § 1983) (against Hackensack, Labrosse, and Canestrino)

**Count 2** — NJ Conscientious Employee Protection Act ("CEPA") (N.J Stat. Ann. § 34:19-1) (against Hackensack, Labrosse, and Canestrino)

**Count 3** — Religious and ethnic discrimination (42 U.S.C. § 1983) (against Hackensack, Labrosse, and Canestrino)

**Count 4** — Religious and ethnic discrimination (NJ Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5) (against Hackensack, Labrosse, and Canestrino)

**Count 5** — Malicious Prosecution (42 U.S.C. § 1983) (against all Defendants)

**Count 6** — Malicious Prosecution Conspiracy (42 U.S.C. § 1983) (against all Defendants)

**Count 7** — Abuse of Process (42 U.S.C. § 1983) (against all Defendants)

**Count 8** — NJ Civil Rights Act ("NJCRA") (N.J. Stat. Ann. § 10:6-2) (against all Defendants)

**Count 9** — State law defamation (against Salkin)

On March 2, 2016, the Court dismissed Count 4 (NJLAD) solely as to Labrosse and Canestrino; Defendants' motion to dismiss Counts 2 and 4 was denied in all other respects. (DE 44, DE 45). Between December 2017 and October 2018, I so-ordered stipulations of dismissal as to Defendants Salkin, Koster, and Borelli. (DE 82; DE 83; DE 112; DE 113).

On January 30, 2020, the remaining Defendants—*i.e.,* Hackensack, Labrosse, and Canestrino—moved for summary judgment on Counts 1, 2, 3, 4, and 8. (DE 146). On January 31, 2020, the same three Defendants filed a second motion for summary judgment on Plaintiffs' common law tort claims, Counts 5 (Malicious Prosecution), 6 (Conspiracy to commit Malicious

Prosecution), and 7 (Abuse of Process). Plaintiff then voluntarily dismissed Counts 5, 6, and 7 and the Count 3 due process claim (but not the Count 3 equal protection claim). The surviving claims were the Count 1 First Amendment retaliation claim, the Count 2 CEPA claim, the Count 3 equal protection claim, and the Count 8 NJCRA claim, all as to Hackensack, Labrosse, and Canestrino. Also remaining was the Count 4 NJLAD claim, against defendant Hackensack only.

On September 12, 2020, I entered an order (DE 157) granting in part and denying in part the remaining Defendants' motion for summary judgment. Specifically, I denied the motion as to Counts 1, 3 (equal protection only), and 8. I granted summary judgment in those defendants' favor as to Counts 2, 3 (due process only) and 4. That order left remaining Count 1 (First Amendment retaliation), Count 3 (equal protection) and Count 8 (corresponding state law claims under the NJCRA).

Defendants Hackensack, Labrosse, and Canestrino now seek reconsideration of the portion of the order that denied summary judgment.

## II.    Discussion

### a.  Legal standard

In the District of New Jersey, motions for reconsideration are governed by Local Civil Rule 7.1(i). Reconsideration is an "extraordinary remedy," to be granted "sparingly." *NL Indus. Inc. v. Commercial Union Ins. Co.*, 935 F. Supp. 513, 516 (D.N.J. 1996). A party seeking to persuade the court that reconsideration is appropriate bears the burden of demonstrating one of the following: "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court [issued its order]; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Café ex rel. Lou–Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (internal citation omitted); *see also Crisdon v. N.J. Dep't of Educ.*, 464 F. App'x 47, 49 (3d Cir. 2012) ("The purpose of a motion for reconsideration . . . is to correct manifest errors of law or fact or to present newly discovered

evidence.") (internal citation omitted). "The Court will grant a motion for reconsideration only where its prior decision has overlooked a factual or legal issue that may alter the disposition of the matter." *Andreyko v. Sunrise Sr. Living, Inc.*, 993 F. Supp. 2d 475, 478 (D.N.J. 2014).

### b. Defendants' Motion for Reconsideration

Defendants submit that the Court made a clear error of fact in applying the summary judgment standard to Plaintiff's First Amendment claim and made a clear error of law regarding the equal protection claim.[2] I will address each argument in turn.

### i. First Amendment claims

Plaintiff brought a First Amendment-based retaliation claim under 42 U.S.C. § 1983 ("Section 1983"). Plaintiff submitted that she made a public statement that angered Defendants at the August 13, 2014 DCA meeting. (DE 150 at 13). She alleged that Defendants eliminated her health insurance and removed her from the library board in retaliation for that public statement. (DE 150 at 17). In support of their motion for summary judgment, Defendants contended that Plaintiff's statements were not protected by the First Amendment because she was speaking in her official capacity as a councilwoman, and not as a private citizen. (DE 146-4 at 18-20). Defendants further submitted that Plaintiff could not establish a causal connection between her statements and any retaliatory action. (DE 146-4 at 20-22).

Section 1983 allows a party who has been deprived of rights, privileges, or immunities secured by the Constitution to seek damages and injunctive relief. As explained in the September 12 Opinion, a prima facie case under Section 1983 requires a plaintiff to demonstrate that: (1) a person deprived her

---

[2]     Defendants address only the First Amendment and equal protection claims under Section 1983. Their arguments apply equally to the substantially similar state-law civil rights claims asserted in Count 8. (*See* DE 159-3 at 3 n.1). *See generally RaCapt. Mos v. Flowers*, 429 N.J. Super. 13, 23 (App. Div. 2012) (stating that NJCRA was "modeled on the federal civil rights law which provides for a civil action for deprivation of civil rights." (citations omitted)); *Ingram v. Twp. of Deptford*, 911 F. Supp. 2d 289, 298 (D.N.J. 2012).

of a federal right; and (2) the person who deprived her of that right acted under color of state law. *Groman v. Twp. of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995) (citing *Gomez v. Toledo*, 446 U.S. 635, 640(1980)). The alleged retaliatory conduct—taking away Plaintiff's health insurance and library board position—consisted of official actions at council meetings. The parties therefore did not dispute Element (2), i.e., that Defendants acted under color of state law. *See Willson v. Yerke*, 604 F. App'x 149, 150 (3d Cir. 2015). What the parties do dispute is Element (1), *i.e.*, that Ms. Greenman was deprived of a federal First Amendment right.

A claim of First Amendment retaliation requires that a plaintiff establish "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising [her] constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006) (citing *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003)). The alleged retaliatory conduct must have had an impact on the plaintiff's First Amendment rights that was more than minimal. *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006); *Brennan v. Norton*, 350 F.3d 399, 419 (3d Cir. 2003).

In the September 12 Opinion, I explained that there was a material issue of fact as to the role in which Plaintiff spoke at the meeting. (DE 156 at 19). The factual dispute, I found, was over whether Plaintiff spoke as a private citizen, as a public employee, or as an elected official. (*Id.*) The distinction is material because if Plaintiff spoke as a private citizen, then her statements are protected; if as a public employee, her right to speak under the First Amendment is limited; and if as an elected official, her speech is protected, but the retaliation, to be impermissible, must rise to the level of interfering with her functioning as an elected official. (*Id.*)

In support of reconsideration, Defendants submit that "there is no evidence in the record to suggest that Plaintiff spoke as a private citizen." (DE

10

159-3 at 7). Rather, they say, everything in the record reflects that Plaintiff was speaking as an elected official:

- She introduced herself as "Councilwoman Rose Greenman"
- She advised DCA that she represented the ". . . minority on the Council."
- All of her statements protesting disputed City expenditures were based on information she obtained by virtue of her elected position on the City Council.

(*Id.*). Defendants maintain the Plaintiff's self-serving claim that she was appearing as a private citizen is unsupported and is insufficient to create a genuine issue of material fact. (*Id.*).

Defendants' recounting of the record is incomplete. In the September 12 Opinion, I relied not only on Plaintiff's claim that she spoke as a private citizen but on the deposition of Defendant Canestrino, who testified that Plaintiff was not invited to speak at the meeting. (DE 150-4, Canestrino Dep. at 121). Indeed, Defendant Canestrino testified that she did not know that Plaintiff would be at the DCA meeting; that she was surprised to see Plaintiff; and that the Council did not appoint Plaintiff to speak at the meeting. (*Id.*). Therefore, contrary to Defendants' assertion, it appears that Plaintiff was exercising the same right to speak as any member of the public. Plaintiff's claim that she spoke as a private citizen is not unsupported. Nor is the claim based on speculation and conjecture; therefore, *Kovalev v. City of Philadelphia*, 362 F. App'x 330, 331 (3d Cir. 2010) is inapposite. *See Kovalev*, 362 F. App'x at 331 (holding that the plaintiff's claims based on speculation and conjecture were insufficient to defeat summary judgment). The same applies to Defendants' citation to *Bond v. Floyd*, 385 U.S. 116 (1966) for the proposition that this Court could not "mak[e] such an important factual finding based on such a sparse record." (DE 159-3 at 8). Again, the Court did not rely solely on Plaintiff's claim that she spoke as a private citizen, but also on the deposition of Defendant Canestrino. I do not say that Plaintiff's position will necessarily prevail; but at this point, she has sufficiently placed her status in dispute.

Defendants' remaining arguments regarding Plaintiff's First Amendment claim do not concern matters of law or fact that the Court overlooked. (*See* DE 159-3 at 8-11). Instead, Defendants make the policy argument that the September 12 decision will "make it far too easy for every elected politician in the state of New Jersey to make a prima facie showing of First Amendment Retaliation simply by solely relying upon his or her own belief that he or she was speaking on some governmental matter as a 'private citizen.'" (DE 159-3 at 8). Defendants also submit that it is unclear how a jury would resolve the question of whether Plaintiff spoke as a private citizen because Plaintiff "failed to present any expert or other evidence." (DE 159-3 at 9). Again, these arguments ignore the Canestrino Deposition, and run afoul of the summary judgment standard, under which I am to identify, not resolve, disputed issues of fact.

Additionally, Defendants submit that "[t]he factual basis of whether or not [an] elected politician has a 'duty' to speak is not remotely a viable methodology to determine whether or not that official speech was made in a public or private capacity." (*Id.*). Even now, they cite no precedent for that view. *A fortiori,* they have not cited authority that the Court "overlooked." *See Andreyko*, 993 F. Supp. 2d at 478. For that reason and the reasons articulated above, I will deny Defendants' motion to reconsider with respect to Plaintiff's First Amendment claims.

### ii.   Equal protection claims

Plaintiff asserted a claim of unequal application of the laws on the basis of her race, religion, and national origin. Specifically, Plaintiff claimed that she was subjected to a hostile work environment in violation of the Equal Protection Clause of the Fourteenth Amendment. (DE 150 at 25).

As explained in the Opinion, courts have adopted Title VII's hostile work environment framework in the context of equal protection discrimination claims brought under Section 1983. *Holt v. Pennsylvania*, 683 F. App'x 151, 160 (3d Cir. 2017) ("And because of the overlap between Title VII claims and

12

constitutional discrimination claims, we have applied Title VII caselaw to equal protection claims."); *Rayfield v. City of Paterson*, No. 17-5144, 2018 WL 2859528, at *7 (D.N.J. June 11, 2018); *Harley v. City of N.J. City*, No. 16-5135, 2017 WL 2779466, at *4 (D.N.J. June 27, 2017) (applying Title VII elements to § 1983 and § 1981 claims); *Hailey v. City of Camden*, 650 F. Supp. 2d 349, 354 (D.N.J. 2009) (same); *Hurley v. Atl. City Police Dep't*, No. 93-260, 1995 WL 854478, at *10 (D.N.J. Aug. 4, 1995), *aff'd*, 174 F.3d 95 (3d Cir. 1999) (stating the Section 1983 "inquiry here mirrors that with regard to the Title VII claims").

Therefore, to establish a hostile work environment claim under the Fourteenth Amendment, a plaintiff must prove "(1) that he or she suffered intentional discrimination because of race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) a basis for personal liability." *Rayfield*, 2018 WL 2859528, at *7; *Ugorji v. N.J. Envtl. Infrastructure Tr.*, No. 12-5426, 2014 WL 2777076, at *5 (D.N.J. June 19, 2014).

Applying that framework, I found that Plaintiff adequately established that she is a member of a protected class in that she is Jewish. (DE 156 at 33). However, I found a material dispute of fact regarding the alleged discriminatory conduct in the form of derogatory comments made by Defendants Labrosse and Canestrino. (DE 156 at 34). My reasoning was as follows:

> The issue here breaks down when assessing the discriminatory conduct alleged. Ms. Greenman has alleged that Defendants made the following comments: Mr. Labrosse (1) told her she was not a real Hackensackian or a real American; (2) stated that he was going to make her life miserable; (3) initially refused to allow her to have a rabbi at her swearing in ceremony; (4) once told her that he attributed the failure of his fish business to Jews failing to patronize his shop; and (5) mocked her accent by asking if she understood English. (Greenman Dep. pp. 55-56, 74-75, 79-83, 91) Ms. Greenman asserts that Ms. Canestrino asked Plaintiff if she was "afraid to be in a church?" and then stated that Plaintiff could not undergo the sacrament because "the holy water will make you fizzle and melt into a puddle of scum." (Id. p. 74, 109-10, 167-68) On a different occasion, Ms. Canestrino is alleged

13

> to have complained about her physician's Hanukah decorations. (Id.) Ms. Greenman also believes the Mayor's withdrawal of her appointment to the library board was ethnically or religiously motivated.
>
> All of these comments, Ms. Greenman asserts, amount to severe and pervasive behavior motivated by racial animus that negatively impacted her work. A line must be drawn between mere offensive language and the creation of a pervasively hostile work environment. A "recurring point" in case law in this area "is that 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.' These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.' " *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (internal citations omitted).
>
> On one view of the facts, the defendants went beyond the mere making of the occasional offensive remark. As Ms. Greenman portrays it, the religious or ethnic abuse was repeated and regular. A finder of fact could find that Ms. Greenman was subjected to disparate treatment based on her religion and ethnicity, in that the abusive acts attributed to defendants could plausibly have had their basis in religious or ethnic prejudice. To be sure, a juror could also remain unconvinced. Ms. Greenman alleges that Labrosse clung to a sense of injury at the hands of Jews and threatened to make her life miserable. Labrosse, on the other hand, proffers that he was predicting, not threatening, a "miserable" experience as a councilwoman if Ms. Greenman did not get with his political program. On this motion for summary judgment, I am required to draw inferences in plaintiff's favor.

(DE 156 at 34-35). Therefore, I denied summary judgment on Count 3. (DE 156 at 35).

Defendants submit that this denial of summary judgment was in error because the Court's analysis overlooked controlling law. (DE 159-3 at 13). Specifically, Defendants argue that (1) the decision disregarded Plaintiff's status as an elected official and the exclusion of such officials from Title VII's protection; (2) the Court failed to analyze supervisory liability; (3) the Court failed to consider that individual defendants cannot be held liable under Title VII; and (4) the Court failed to analyze municipal liability. (DE 159-3 at 13).

### 1. Statutory Definition of Employee Under Title VII

Under Title VII, "employee" is a defined term. Somewhat circularly, it is defined as, *inter alia*, "an individual employed by an employer, except that the term 'employee' shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof." 42 U.S.C.A. § 2000e(f). Because elected officials are excluded from that definition, Defendants submit, Plaintiff is not an employee for purposes of her hostile work environment claim. (DE 159-3 at 14). And, they submit, each case cited by the Court in finding that Plaintiff had a plausible claim involved public employees, not elected officials. (DE 159-3 at 14-15); *see also Holt*, 686 F. App'x at 153 (state trooper); *Rayfield*, 2018 WL 2859528 at *1 (police officers); *Harley*, 2017 WL 2779466 at *1 (messenger for the City of Jersey City); 650 F. Supp. 2d at 351 (fire department officers); *Hurley*, 1995 WL 854478 at *1 (police officers).

Although the elements of a hostile work environment claim are the same under Section 1983 and Title VII, there are important differences. As the court explained in *Harley*:

> Section 1983 only applies to state actors, while Title VII applies to both private and public employers. *See Johnson v. Transportation Agency, Santa Clara Cty., Cal.*, 480 U.S. 616, 628 (1987) ("Congress expressly indicated the intent that [ ] Title VII principles be applied to governmental and private employers alike."); *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995) (finding that liability under Section 1983 is limited to state actors or those acting under the color of law). Since Section 1983 applies to a person acting "under the color of law," it applies to individuals as well as entities, whereas Title VII does not apply to individuals. *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 247 (2009) ("§ 1983 equal protection claims may be brought against individuals as well as state entities."); *Di[ci] v. Com. of Pa.*, 91 F.3d 542, 552 (3d Cir. 1996) ("[I]ndividual employees cannot be held liable under Title VII."). Additionally, a Section 1983 action requires intentional discrimination, *see Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 274 (1979), while a Title VII claim can be brought pursuant to a theory of intentional discrimination or disparate impact. *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 1002 (1988) (discussing two theories of Title

> VII liability and noting that a disparate impact theory focuses on
> the effect of the employment practice rather than an employer's
> intent).

*Harley*, 2017 WL 2779466 at *4 n.5. Thus, in analyzing a Section 1983 hostile work environment claim, the courts import Title VII's analytic framework, but not necessarily its statutory exclusions.

The distinctions between Title VII and Section 1983 seemingly lie at the heart of at least one court's holding that the two are not duplicative. As a court in this district has recognized, the argument that a plaintiff's Section 1983 claim is subsumed by a Title VII claim "glosses over an important distinction frequently drawn by courts which have examined the relationship between Title VII and [Section] 1983." *Hargrave v. Cty. of Atl.*, 262 F. Supp. 2d 393, 439 (D.N.J. 2003). That is, while "courts have often precluded plaintiffs from pursuing [Section] 1983 claims based on the alleged violation of rights created by Title VII," the two causes of action are not redundant or mutually exclusive; "when a plaintiff alleges conduct which violates both rights guaranteed by the Constitution and the statutory rights created by Title VII, a plaintiff may bring either a Title VII claim, a [Section] 1983 claim, or both." *Id.* at 440; *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1079 (3d Cir. 1990). Here, Plaintiff's right to equal treatment is protected by *both* Title VII and the Fourteenth Amendment. Thus, at the very least, it cannot be said that Title VII precludes or rules out a Section 1983 claim. *See Hargrave*, 262 F. Supp. 2d at 439-40.

Admittedly, the case law does not go any farther than that. It is not apparent to me, however, that the broad constitutional guarantees found in the Fourteenth Amendment and Section1983 are or ought to be subject to the particulars of a statutorily defined term in Title VII, *i.e.*, "employee." Section 1983 is a broad guarantee of freedom from unconstitutional state action, not a regulation of private employment. The defendants have not cited a single case (whether "overlooked" or otherwise) in which a court applied Title VII's definition of "employee" to a hostile work environment claim brought under

Section 1983. (*See* DE 159-3 at 14-15). Therefore, I will not grant reconsideration on this point.

## 2. Supervisory and Individual Liability

Next, Defendants contend that Plaintiff, as an elected official, does not have a supervisor, and that Defendants Labrosse and Canestrino, in particular, are not her supervisors. (DE 159-3 at 15-18). It follows, they argue, that they cannot be held individually liable pursuant to a Fourteenth Amendment hostile work environment claim, because Title VII does not provide for liability of individual, non-supervisory employees. (DE 159-3 at 18).[3]

It is true that the Plaintiff did not have a supervisor who controlled or directed her work. (DE 156 at 26). However, unlike Title VII, which rules out liability for individuals *qua* employees, Section 1983 imposes liability on state actors generally. *Harley*, 2017 WL 2779466 at *4 n.5 (citing *Fitzgerald*, 555 U.S. at 247; *Dici*, 91 F.3d at 552).[4]

Again, while courts apply the analytic framework of Title VII to hostile work environment claims under Section 1983, there are significant distinctions between those two statutes. *See Harley*, 2017 WL 2779466 at *4 n.5. Plaintiff asserts a violation of her Fourteenth Amendment rights of equal protection pursuant to Section 1983. Section 1983 does not preclude individual liability. Therefore, I decline to grant reconsideration of this issue.

## 3. Municipal Liability

Finally, Defendants submit that the Court overlooked controlling case law in finding that Hackensack, as a municipality, was liable under Section

---

[3]   With respect to the alleged discriminatory acts (*e.g.,* ethnic and religious insults), the Court determined that individual defendants Labrosse and Canestrino were not protected by absolute legislative immunity. Defendants do not move for reconsideration of that ruling. (DE 161 at 3).

[4]   Indeed, Section 1983 stresses individual liability. It rules out *respondeat superior, see Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978), and permits actions for damages, not against the state, but only against state officials in their individual capacities, *see Hafer v. Melo*, 502 U.S. 21, 26, 112 S. Ct. 358, 362 (1991).

1983. (DE 159-3 at 19-21). Specifically, they submit that Plaintiff has not established a policy or custom that could potentially give rise to *Monell* liability. (DE 159-3 at 19). The summary judgment motion was brought on behalf of two individual defendants, but it was brought on behalf of the City as well. Defendants are therefore correct that the Court should have separately considered the issue of the City's liability, which is subject to a specialized jurisprudence under Section 1983. (*See* DE 156 at 30-35).[5]

Municipalities are "included among those persons to whom [Section] 1983 applies." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). However, "a municipality cannot be held liable under [Section] 1983 on a respondeat superior theory." *Id.* at 691. Rather, such entities may only be held liable for constitutional torts caused by "action pursuant to official municipal policy of some nature." *Id.* Relief is appropriate where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," or where the constitutional deprivation arises from "a governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 290-91.

To succeed on a Section 1983 claim against a municipality, the "plaintiff must identify the challenged policy, attribute it to the city itself, and show a causal link between execution of the policy and the injury suffered." *Losch v. Borough of Parkesburg*, 736 F.2d 903, 910 (3d Cir. 1984). Causation "can be established by alleging 'that policymakers were aware of similar conduct in the past, but failed to take precautions against future violation, and that this failure, at least in part, led to their injury.'" *Gottlieb ex rel. Calabria v. Laurel*

---

[5]     Thus, the claim is not that the Court analyzed the issue incorrectly, but rather that I did not analyze it at all. Defendants are not entitled to have the issue decided twice, but they are entitled to have it decided once. I therefore find it appropriate for analysis on a motion for reconsideration.

*Highlands Sch. Dist.*, 272 F.3d 168, 176 (3d Cir. 2001) (quoting *Losch*, 736 F.3d at 910).

In the September 12 Opinion, I found a material issue of fact as to whether the derogatory comments allegedly made by individual defendants Labrosse and Canestrino added up to disparate treatment on the basis of religion and ethnicity. Plaintiff, however, has not connected those comments to a municipal policy or custom. (*See* DE 150 at 25-28). Indeed, Plaintiff asserted that these two individuals subjected her to a hostile work environment in *violation* of Hackensack's Anti-Harassment Policy. (DE 150 at 25).

Plaintiff has submitted evidence that she complained of the derogatory comments to the City's attorney and requested an investigation, but no investigation took place. (DE 150-1; DE 150-16 at 2-3). However, the Third Circuit has held that a failure to investigate an allegation of wrongdoing, without more, "does not provide sufficient proof of a policy or custom to satisfy the dictates of [Section]1983." *Groman v. Twp. of Manalapan*, 47 F.3d 628, 637 (3d Cir. 1995); *Boseski v. N. Arlington Municipality*, 621 F. App'x 131, 135 (3d Cir. 2015) ("[T]o the extent that the complaint purports to allege police harassment or the failure of certain police officers to investigate her complaints, [plaintiff] has not alleged that her injuries were the result of a policy or custom, so as to implicate municipal liability under [Section] 1983.").

Further, the evidence is not sufficient to hold the City liable for the statements of Labrosse and Canestrino based on their status as mayor and deputy mayor. In certain circumstances, the actions of high-ranking city officials may be sufficient to create municipal liability; indeed, such statements may in some cases constitute municipal policy. However, "only the conduct of those officials whose decisions constrain the discretion of subordinates constitutes the acts of the municipality." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990). In other words, the actor must have the power to implement policy on behalf of the municipality for liability to attach to the municipality. *See id.* ("[A] plaintiff must show that an official who has the power

19

to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom."); *LaVerdure v. Cty. of Montgomery*, 324 F.3d 123, 126 (3d Cir. 2003) ("Proving that a municipal official is a final policymaking authority is a fundamental element of a § 1983 cause of action against a municipality.")

The Third Circuit recognizes several circumstances in which an individual's conduct constitutes an official policy or practice, including the following:

> (1) the individual acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity,
> (2) the individual himself has final policy-making authority such that his conduct represents official policy, or
> (3) a final policy-maker renders the individual's conduct official for liability purposes by having delegated to him authority to act or speak for the government, or by ratifying the conduct or speech after it has occurred.

*Hill v. Borough of Kutztown*, 455 F.3d 225, 245 (3d Cir. 2006) (line breaks added).

In determining whether an official has final policy-making authority, "a court must determine (1) whether, as a matter of state law, the official is responsible for making policy in the particular area of municipal business in question, and (2) whether the official's authority to make policy in that area is final and unreviewable." *Id.* (internal citations omitted). Hackensack operates under a Council-Manager form of government pursuant to N.J. Stat. Ann. § 40-79-1 *et seq.*. In that context, I find insufficient evidence that Labrosse and Canestrino possessed the final and unreviewable authority to make policy.

Under a Council-Manager arrangement, the municipal council is the governing body of the municipality. The council possesses "all administrative, judicial and legislative powers and duties" and has "complete control and supervision over the affairs of the municipality." N.J. Stat. Ann. § 40:81-9. The municipal manager is the chief executive and administrative official of the municipality. N.J. Stat. Ann. § 40:82-4. Additionally, "[t]he municipal manager

20

shall in all matters act under the direction and supervision and subject to the approval of the municipal council." *Id.* Based on that statutory structure, the final-policy making authority lies with the municipal council. And, in such circumstances where the council as a whole has policymaking authority, only actions taken on behalf of the entire council—not actions or statements of individual council members—bind the municipality. *See LaVerdure v. Cty. of Montgomery*, 324 F.3d 123, 125 (3d Cir. 2003) ("It is undisputed that only a majority of the three-member Board is authorized to establish policy on behalf of the County. Therefore, whatever the contents of Marino's statements, because he was only one member of the Board, those comments do not constitute County policy.") (internal citations omitted).

Here, Labrosse is the mayor and Canestrino is the deputy mayor. The duties of the mayor are defined by statute:

> The mayor shall preside at all meetings of the municipal council and shall have a voice and vote in its proceedings, but shall not have the power of veto. He shall fill vacancies occurring in the trustees of the public library for such terms of offices as are provided by law. All bonds, notes, contracts and written obligations of the municipality shall be executed on its behalf by the mayor or, in the event of his inability to act, by such councilman as the municipal council shall designate to act as mayor during his absence or disability. The powers and duties of the mayor shall be only such as are expressly conferred upon him by this subtitle.

N.J. Stat. Ann. § 40:81-8.

Based on the structure of the Council-Manager form of government, the mayor does not possess the same level of authority as the municipal council. Therefore, although Labrosse and Canestrino are liable for their own statements, those statements alone do not express policy or create liability for the City. Because Plaintiff did not establish a custom or practice from which this unconstitutional conduct flowed, Defendant Hackensack cannot be liable for the alleged discriminatory statements of individual defendants Labrosse and Canestrino. *See Monell*, 436 U.S. at 690.

I turn to the hostile work environment claim based on the cancellation of Plaintiff's health insurance. With respect to that claim, I found that individual defendants Labrosse and Canestrino were immune from suit because the action was legislative in nature: "The cancellation consisted of a resolution proposed by a council member, voted on, and adopted by the council". (DE 156 at 32). I nevertheless consider, in the alternative, the issue of the potential liability of the City itself.

The issuance of a resolution or ordinance is not sufficient to establish *Monell* liability where the ordinance itself is not an unconstitutional policy. *Brown v. City of Pittsburgh*, 586 F.3d 263, 293 (3d Cir. 2009). That holding flows from the principle that "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing . . . municipal policy, which policy can be attributed to a municipal policymaker." *Id.* at 292 (internal quotation marks omitted) (alterations in original) (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion)).

In *Brown*, the plaintiff challenged, on First Amendment grounds, the constitutionality of an ordinance that provided a buffer zone in front of facilities providing abortions. *Id.* at 266. Individuals were prohibited from congregating or picketing within that zone. *Id.* The plaintiff argued, *inter alia*, that the Pittsburgh police "discriminated on the basis of viewpoint in enforcing the statute, applying its restrictions only to pro-life protesters like Brown and not to clinic workers and volunteers." *Id.* at 292. The Third Circuit explained that "because the Ordinance on its face does not discriminate based on content or viewpoint, Brown can prevail only if she establishes a pattern of discriminatory enforcement evincing an intent to target particular viewpoints." *Id.* That plaintiff argued that "the Ordinance itself" was the policy giving rise to municipal liability. The Court held, however, that because "the Ordinance itself is not an unconstitutional policy," the plaintiff was required to demonstrate a pattern of unlawful favoritism in applying the Ordinance. *Id.* at 293.

Here, it has not been argued that the resolution cancelling the health insurance of all council members is facially unconstitutional. Nor has it been alleged or established that the cancellation of health insurance was attributable to an existing municipal policy that was discriminatory on its face or applied in a discriminatory manner. Therefore, that resolution alone is not sufficient to establish municipal liability. *See Brown*, 586 F.3d at 293.

In light of the foregoing, I find that Plaintiff has failed to establish municipal liability with respect to her equal protection claims. Therefore, I will grant Defendants' motion for reconsideration on that basis and grant summary judgment in favor of the City of Hackensack only.

### III.   Conclusion

For the reasons set forth above, I will deny in part and grant in part Defendants' motion for reconsideration (DE 159), as follows:

1. With respect to Plaintiff's Count 1 First Amendment claim and the corresponding state law claim in Count 8, the motion is **DENIED**.

2.  With respect to Plaintiff's Count 3 equal protection claim and the corresponding state law claim in Count 8, the motion is **GRANTED** as to Defendant City of Hackensack only.

3. Defendants' motion for reconsideration is **DENIED** in all other aspects.

So, to clarify, the remaining claims are as follows:

Count 1 (1st Amendment retaliation)–Labrosse, Canestrino, and City

Count 3 (equal protection) – Labrosse and Canestrino only

Plus the corresponding Count 8 claims under the NJCRA.

An appropriate order follows.

Dated: March 9, 2021

/s/ Kevin McNulty

_____
**Kevin McNulty**
**United States District Judge**

23